[No. B161255. Second Dist., Div. Eight. Oct. 28, 2005.]

In re the Marriage of JOHN McTIERNAN and DONNA DUBROW.
JOHN McTIERNAN, Appellant, v.
DONNA DUBROW, Appellant.

COUNSEL

Kolodny & Anteau, Stephen A. Kolodny, Lauren S. Petkin and James L. Keane for Appellant John McTiernan.

Dapeer, Rosenblit & Litvak and William Litvak for Appellant Donna Dubrow.

OPINION

**FLIER, J.**—John McTiernan (husband) and Donna Dubrow (wife) both appeal from a judgment in the dissolution of their marriage. Their appeals raise distinct issues. Husband primarily challenges the trial court's determination that there existed goodwill in his business as a motion picture director, and that all of the $1.5 million of goodwill constituted community property. Husband also contests a ruling that he must reimburse wife's share of profits that were lost after husband sold certain community securities without her consent, and in violation of the automatic injunctive order imposed upon commencement of the proceedings. (Fam. Code, § 2040, subd. (b).)

In her appeal, wife contends that the court abused its discretion by limiting her postdissolution spousal support to two years, and by characterizing several months of pendente lite payments as community property distributions rather than temporary support. Wife also asserts that the judgment should be modified to preserve jurisdiction over support beyond the two-year period. Finally, wife contends that the court abused its discretion by reducing husband's obligation to pay wife's attorney fees, by reason of an irrelevant and inaccurate reckoning of her postdissolution estate.

We find merit in husband's contention that there is no goodwill in his career as a motion picture director. We also find merit in wife's contentions regarding the duration of spousal support and retention of jurisdiction. We reverse the judgment as to those elements, and affirm it in all other respects.

## FACTS

The parties were married in November 1988. They separated in July 1997, and husband commenced this proceeding the following month. The matter was extensively litigated, including 21 days of trial, conducted between June 1999 and June 28, 2000. The court's 34-page statement of decision was filed August 23, 2000, and the judgment under review was entered on August 28, 2002. At that time, husband was 51 years old and wife was 59.

The evidence showed that, during and after the marriage and to some extent before, husband was a very successful motion picture director, commanding six- to high seven-figure compensation per film, and having to his credit such blockbusters as Die Hard (20th Century Fox 1988), The Hunt for Red October (Paramount Pictures 1990), and The Thomas Crown Affair (Metro-Goldwyn-Mayer 1999). Wife also pursued a career in motion picture production, and before the marriage she was earning $195,000 a year as a production company executive. She produced several films during the marriage, while accompanying husband in his directorial pursuits. The trial court found that during the eight and three-quarter years of marriage before separation, husband had earned approximately $15 million, and wife had earned about $1 million. Predictably, the parties' community estate was substantial, as was the scale of their lifestyle.

Because the issues raised on these appeals largely involve distinct factual and legal bases, we will state the facts relevant to each issue in conjunction with its discussion. We proceed to consideration of the issues.

## I. HUSBAND'S APPEAL

### A. Professional Goodwill

#### 1. *The Trial Court's Ruling and Husband's Contention on Appeal*

The trial court found that husband "is a motion picture director who has achieved exceptional success in that field. His success is dependent upon his personal skill, experience and knowledge, and the Court finds that, in that respect, the profession which he practices is similar to that of an attorney, physician, dentist, accountant, editor, architect, or any other professional who has established a successful professional practice, with quantifiable expectation of future patronage, based upon his or her personal skill, experience and knowledge."

The finding that husband has achieved exceptional success as a motion picture director is based for the most part on testimony presented by Arthur De Vany, Ph.D., an economist who is a professor in the Department of Economics of the Institute of Mathematics and Behavioral Sciences at the University of California, Irvine. The trial court found that the "evidence presented by Dr. De Vany was persuasive . . . that Petitioner [husband] has developed an earning capacity and reputation in his profession as a motion picture director which greatly exceeds that of most persons involved in that profession and that Petitioner commands a premium for his services. [¶] In addition, the evidence established that Petitioner can reasonably expect to

continue to enjoy said premium. In other words, he has expectation of continued patronage at his prior level of compensation."

The trial court detailed the facts upon which these conclusions were based. Among these facts are that husband is ranked No. 13 among 1,058 motion picture directors in cumulative box office revenues during 1985–1996, No. 8 in terms of gross domestic revenues produced by movies he directed, and No. 1 in terms of production budgets entrusted to his control. Husband does not contest the trial court's conclusion that all of this boils down to the fact that he has, in the trial court's words, "elite professional standing."

■ The trial court determined the value of husband's goodwill by means of the "excess earnings" approach. It has been noted that the "excess earnings" method is a method that is commonly used to determine the value of the goodwill in a professional practice. (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2005) ¶ 8:1445, p. 8-350.) Broadly put, the excess earnings approach is predicated on a comparison of the earnings of the professional in question with that of a peer whose performance is "average."[1] Using this method with some modifications, the trial court determined that husband's goodwill at the time of separation was $1.5 million.

Husband contends that he does not possess an asset that can be properly classified as goodwill. Relying on *In re Marriage of Rives* (1982) 130 Cal.App.3d 138, 153 [181 Cal.Rptr. 572], and *In re Marriage of Aufmuth* (1979) 89 Cal.App.3d 446, 460–462 [152 Cal.Rptr. 668],[2] among other cases, husband points out that skill, reputation and experience are not community property. Husband contends that the goodwill found to exist in this case is in reality nothing other than his skill, reputation and experience.

---

[1] "Pursuant to this method, one first determines a practitioner's average annual net earnings (before income taxes) by reference to any period that seems reasonably illustrative of the current rate of earnings. One then determines the annual salary of a typical salaried employee who has had experience commensurate with the spouse who is the sole practitioner or sole owner/employee. Next, one deducts from the average net pretax earnings of the business or practice a 'fair return' on the net tangible assets used by the business. Then, one determines the 'excess earnings' by subtracting the annual salary of the average salaried person from the average net pretax earning of the business or practice remaining after deducting a fair return on tangible assets. Finally, one capitalizes the excess earnings over a period of years by multiplying it by a factor equal to a specific period of years, discounted to reflect present value of the excess earnings over that period. The period varies according to factors such as the type of business, its stability, and its earnings trend." (*In re Marriage of Garrity and Bishton* (1986) 181 Cal.App.3d 675, 688, fn. 14 [226 Cal.Rptr. 485].) As noted (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:1445, p. 8-350), this description may be flawed, especially in subtracting the annual salary of the average *salaried* person, when the comparison should be with a peer who, in the usual setting, will not be salaried. (See *In re Marriage of Iredale & Cates* (2004) 121 Cal.App.4th 321, 329–330 [16 Cal.Rptr.3d 505].)

[2] Disapproved on other grounds in *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 815 [166 Cal.Rptr. 853, 614 P.2d 285].

### 2. *The Issue Defined*

■ The trial court found that husband has a "quantifiable expectation of future patronage." Future, or continued, public patronage is one essential aspect of goodwill. "The 'good will' of a business is the expectation of continued public patronage." (Bus. & Prof. Code, § 14100.) However, there is more to goodwill than expectation of continued patronage. "The good will *of a business* is property and is transferable." (Bus. & Prof. Code, § 14102, italics added.)

Since the goodwill *of a business* is property (Bus. & Prof. Code, § 14102), the question is: What is the meaning of "a business" in the definition of goodwill?

There are two possible answers.

One answer is that the term "a business" also includes "a person doing business." This is the interpretation that the trial court adopted in this case.

■ The other answer is that "a business" refers to a professional, commercial or industrial enterprise with assets, i.e., an entity other than a natural person.

There are three reasons why the second answer is the better one. First, it conforms to the historical understanding of goodwill. Second, the plain text of Business and Professions Code sections 14100 and 14102, which, in this respect, have not been amended since their enactment in 1872, speaks of "a business," and not of natural persons. Third, interpreting the term "a business" as it appears in Business and Professions Code sections 14100 and 14102 to refer to a professional, commercial or industrial enterprise with assets ensures that the interest that is divided as goodwill is "property," as "property" is defined by law.

### 3. *The Historical Understanding of "a Business"*

The precursors of Business and Professions Code sections 14100 and 14102 were Civil Code sections 992 and 993, which were enacted in 1872 as part of the Civil Code.[3] Contemporaneously with the enactment of the

---

[3] Former Civil Code section 992 provided: "The good will of a business is the expectation of continued public patronage, but it does not include a right to use the name of any person from whom it was acquired." Former Civil Code section 993 provided: "The good will of a business is property, transferable like any other." These provisions, originally chaptered in the Civil Code under the heading "OTHER KINDS OF PERSONAL PROPERTY," were repealed in 1941 and reenacted at the same time, respectively, as Business and Professions Code sections

California Civil Code in 1872, and as of the closing decades of the 19th century, the courts spoke of goodwill as an incident of an existing business; goodwill did not exist in the abstract, apart from a business. "Undoubtedly, good will is in many cases a valuable thing, although there is difficulty in deciding accurately what is included under the term. It is tangible only as an incident, as connected with a going concern or business having locality or name, and is not susceptible of being disposed of independently." (*Metropolitan Bank v. St. Louis Dispatch Co.* (1892) 149 U.S. 436, 446 [37 L.Ed. 799, 13 S.Ct. 944].)[4]

California decisions echoed this view, rejecting that goodwill attaches to the shares of stock. "It would be strange to predicate good-will as pertaining to or extending to an abstraction, to an 'artificial being, invisible, intangible, and existing only in contemplation of law.' " (*Spring Valley W.W. v. Schottler* (1882) 62 Cal. 69, 118, cited with approval in *Merchants' Ad-Sign Co. v. Sterling* (1899) 124 Cal. 429, 432 [57 P. 468].)[5] The courts spoke of the fact that goodwill was not separable from the physical assets of the business that generated the goodwill. (E.g., *Russell v. Russell* (1918) 39 Cal.App. 174, 176–177 [178 P. 307]; *Ward-Chandler Bldg. Co. v. Caldwell* (1935) 8 Cal.App.2d 375, 378 [47 P.2d 758].) This led text writers to state that goodwill cannot be sold independently of the business or the physical elements or assets to which it is incident (35 Cal.Jur.3d (1988) Good Will, § 5, at fn. 43), which is a view supported by the court in *Metropolitan Bank v. St. Louis Dispatch Co., supra,* 149 U.S. 436, 446.

One of the classic definitions of goodwill in our case law appears in *In re Lyons* (1938) 27 Cal.App.2d 293, 297–298 [81 P.2d 190].[6] This definition,

---

14100 and 14102. Besides goodwill, the "other kinds of personal property" recognized in the 1872 enactment of the Civil Code were trademarks (former Civ. Code, § 991) and instruments essential to the title deeds of real property (Civ. Code, § 994).

[4] The court went on to give a definition of goodwill: "Mr. Justice Story defined good will to be 'the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices.' Story Part. § 99." (*Metropolitan Bank v. St. Louis Dispatch Co., supra,* 149 U.S. at p. 446.)

[5] A commentator writing in 1908 summarized decisions handed down in Michigan, Nebraska, New Jersey, New York and by some federal courts, including those cited in the text, as holding that "[t]he right to good-will cannot exist as a mere abstract right independent of business, but is in the nature of appurtenance to business in connection with which it is used." (Note 4, 2 Kerr's Codes of Cal. (1908 ed.) foll. § 993, p. 824.)

[6] "Good will has been defined 'to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from

which is the same as offered in *Metropolitan Bank v. St. Louis Dispatch Co.*, *supra*, 149 U.S. at page 446, predicates the existence of goodwill on the operations of a business entity with assets separate and distinct from the person or persons who operate, own or manage the business.

In this respect, nothing had changed since these early cases were decided. No California case has held that a natural person, apart and distinct from a "business," can create or generate goodwill. In the instance of professionals, the courts have spoken of "the nature and duration of his business as a sole practitioner" (*In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 109–110 [113 Cal.Rptr. 58]) and of the value of a "professional practice" (*Golden v. Golden* (1969) 270 Cal.App.2d 401, 405 [75 Cal.Rptr. 735]; see also *Todd v. Todd* (1969) 272 Cal.App.2d 786, 792 [78 Cal.Rptr. 131]). It is the business, i.e., the practice, that generates goodwill, even if the practice is conducted by a sole practitioner, as was the case in *Golden* and *Todd*. (See Annot. (1990) 76 A.L.R.4th 1025; Annot. (1990) 79 A.L.R.4th 171.)

4. *Business and Professions Code Sections 14100 and 14102 Endow a Business, and Not a Person, with the Capacity to Generate Goodwill*

■ "There is order in the most fundamental rules of statutory interpretation if we want to find it. The key is applying those rules in proper *sequence*. [¶] First, a court should examine the actual language of the statute. . . . [¶] In examining the language, the courts should give to the words of the statute their ordinary, everyday meaning . . . . [¶] If the meaning is without ambiguity, doubt, or uncertainty, then the language controls." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238–1239 [8 Cal.Rptr.2d 298], citations omitted.)

There is no doubt about the "ordinary, everyday meaning" of the term "a business," nor is the term ambiguous or uncertain. In the term "a business," the word "business" is a noun, and means a professional, commercial or industrial enterprise with assets. It is also clear that "a business" is not a natural person.

---

constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances, or necessities, or even from ancient partialities or prejudices. (Story on Part., Sec. 99.) . . . According to Lord Eldon it is the probability that the old customers will resort to the old place. It is the probability that the business will continue in the future as in the past, adding to the profits of the concern and contributing to the means of meeting its engagements as they come in.' " (*In re Lyons, supra*, 27 Cal.App.2d at pp. 297–298, cited in 11 Witkin, Summary of Cal. Law, *supra*, Community Property, § 69.)

It may be asked whether the term "a business" should be read to include "a person doing business," in which event Business and Professions Code section 14102 would effectively read: "The good will of a business *or of a person doing business* is property and is transferable."

It is not within the powers of a court to amend the statute in such a fashion. And there is no doubt that this would be an amendment of the statute. It would enlarge the scope of the statute beyond the traditional understanding of goodwill, which anchors goodwill to a business establishment with assets. Nor can it be said that "a person doing business" is logically included in the term "a business." In the ordinary, everyday sense, "a business" refers to an establishment, a thing, and not a person. With deference to our dissenting colleague, expanding Business and Professions Code section 14102 to state "[t]he good will of a business *or of a person doing business* is property and is transferable" should be left to the Legislature, especially since such an expansion involves considerations of social policy, as appears in the following paragraph.

Endowing "a person doing business" with the capacity to create goodwill, as opposed to limiting goodwill to "a business," has wide ramifications. "A person doing business" includes much of the working population. Notably, there would be no principled distinction between husband in this case, who is a director, and actors, artists and musicians, all of whom could be said to be "persons doing business. " Thus, all such persons who would have the "expectation of continued public patronage" would possess goodwill. This would create a substantial liability, as in this case, without a guaranty that the liability would be funded. It is clear that, from an economic perspective, the "goodwill" in this case is based on earnings, and that "goodwill" is an expression of husband's earning capacity.[7] However, there is no guaranty, especially in the arts, that earnings will not decline or even dry up, even though expectations were to the contrary. In such an event, a person would find him- or herself saddled with a massive liability without the means of satisfying it. Putting it another way, endowing directly persons with the ability to create goodwill would create an "asset" predicated on nothing other than predictions about earning capacity.

---

[7] While we acknowledge that the "excess earning" method of valuing goodwill in a professional corporation is generally accepted, it is true that this method is not far removed from a prediction about future earnings. For good and sufficient reasons, the *expectancy of future earnings* may not be considered in determining goodwill. (See generally 11 Witkin, Summary of Cal. Law, *supra*, Community Property, § 71.) Whether categorized as "excess earnings" or "future earnings," the point is that this type of goodwill is an expression of earnings that have not yet been paid. Thus, when, as here, a person "doing business" is found to have goodwill, and the goodwill is measured by the excess earnings approach, the "asset" that is created is a prediction, not a fact. This is quite a distance from an established business enterprise with assets, and a clientele, that has generated goodwill in the traditional sense.

5. *Interpreting the Term "a Business" As It Appears in Business and Professions Code Sections 14100 and 14102 to Refer to a Professional, Commercial or Industrial Enterprise with Assets Ensures That the Interest That Is Divided As Goodwill Is "Property."*

■ The trial court found that husband "has developed an earning capacity and reputation in his profession as a motion picture director which greatly exceeds that of most persons involved in that profession and that [husband] commands a premium for his services." In order for this to be divisible as community property, it must be, in the first place, property, and, in the second place, it must have been acquired during marriage. "Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property." (Fam. Code, § 760.)[8]

■ Since every kind of property that is not real is personal (Civ. Code, § 663), the property interest in this case, if it exists, must be personal. Personal property may be incorporeal (*King v. Gotz* (1886) 70 Cal. 236, 240 [11 P. 656]), i.e., without tangible substance, and it may be intangible in the sense that it is a right rather than a physical object. (*Navistar Internat. Transportation Corp. v. State Bd. of Equalization* (1994) 8 Cal.4th 868, 875 [35 Cal.Rptr.2d 651, 884 P.2d 108].) But, even if incorporeal or intangible, property must be capable of being transferred. "[I]t is a fundamental principle of law that one of the chief incidents of ownership in property is the right to transfer it." (*Bias v. Ohio Farmers Indemnity Co.* (1938) 28 Cal.App.2d 14, 16 [81 P.2d 1057].) "A common characteristic of a property right, is that it may be disposed of, transferred to another." (*Douglas Aircraft Co. v. Byram* (1943) 57 Cal.App.2d 311, 317 [134 P.2d 15].)

Husband's "earning capacity and reputation in his profession as a motion picture director which greatly exceeds that of most persons involved in that profession" or, in the trial court's shorthand, his "elite professional standing," cannot be sold or transferred. His high standing among other motion picture directors is entirely personal to him. He cannot confer on another director his standing as No. 13 in cumulative box office revenues during 1985–1996. He cannot sell this standing to another, because a buyer would not be John McTiernan, no matter how much the buyer was willing to pay. For the same reason, and unlike a law or medical practice, husband cannot transfer his

---

[8] All further statutory references are to the Family Code, unless otherwise noted.

"elite professional standing." That standing is his, and his alone, and he cannot bestow it on someone else. Thus, an essential aspect of a property interest is absent.

The fact that husband's "elite professional standing" is not transferable effectively refutes the trial court's conclusion that husband's "practice" as a motion picture director is like the "practice" of an attorney or physician. The practice of an attorney, physician, dentist, or accountant is transferable, but husband's "elite professional standing" is his alone, and not susceptible to being transferred or sold.

That husband's "elite professional standing" is not a property interest is also reflected by the trial court's calculation of husband's "goodwill." Under the excess earnings method, the court must deduct from the average net pretax earnings of the business being valued the "fair return" on the "net tangible assets used by the business." (Fn. 1, *ante.*) No such deduction was made in this case, and the comparison was between husband's pretax net income, and that of a motion picture director who is compensated at minimum levels. Thus, the trial court's calculation of "goodwill" demonstrates that there was no business—there were no assets—that would qualify as property.

Were we to construe the goodwill *of a business* as the trial court did in this case, we would be faced with a conflict between Business and Professions Code section 14102 (the goodwill of a business is property) and the fundamental concept that property is transferable. Under section 14102, we would call "property" something that is not transferable, and therefore is not property. Instead, we anchor goodwill to "a business," as the statute requires. This ensures that goodwill is attached to property that is transferable, as a professional, commercial or industrial enterprise is transferable.

In sum, adhering to the rule that property, in order to qualify as property, must be transferable is not a theoretical exercise. Something that cannot be transferred or sold has no value on the market. Dividing such a nontransferable quantity as community property therefore creates an obligation without ensuring that that obligation can be funded. However, when "a business" with assets is divided, there is some assurance that the obligation created by the division can and will be met.

### 6. *Respondent's Arguments in Support of the Trial Court's Finding of Goodwill Are Without Merit*

Respondent contends that the "existence of a business in the traditional sense is not a prerequisite to finding professional goodwill." The contrary is

true. As we have seen, the plain text of Business and Professions Code sections 14100 and 14102, as well as its predecessors, refers to the "good will of a business." As we have shown, this is a reference to a professional, commercial or industrial enterprise with assets.

■ Respondent contends that since there is substantial evidence that husband has an expectation of continued public patronage, husband has goodwill. This begs the question. It is true that "[t]he 'good will' of a business is the expectation of continued public patronage." (Bus. & Prof. Code, § 14100.) However, the "expectation of continued public patronage" must be generated by "a business." A business is a professional, commercial or industrial enterprise with assets; "a business" is not earning capacity or professional reputation.

Finally, the fact that the trial court was able to, and did, apply the "excess earnings" method to calculate goodwill does not mean that there is goodwill in this case. Boiled down to its essentials, the excess earnings method is a comparison of husband's earnings with that of an "average" peer. The fact that this calculation can be performed, as it was performed, does not convert husband's skill and reputation into "a business," and does not transmute unique and idiosyncratic talents into property that can be transferred or sold.

■ We conclude that the trial court erred in finding that there was goodwill in husband's practice or career as a motion picture director. Accordingly, the judgment must be modified to eliminate $1.5 million in assets that are subject to division. As noted in the text, *post*, this affects the calculation of attorney's fees under the formula crafted by the trial court.

### B. Remedy for Violation of Restraining Order

Husband's final assignment of error concerns the remedy imposed for his violation of a restraining order. Pursuant to sections 2040, subdivision (a)(2), and 233, subdivision (a), upon service of the petition for dissolution both parties became subject to a temporary restraining order against their transferring or disposing of any property, "whether community, quasi-community, or separate," without an order of the court or written consent of the other party, "except in the usual course of business or for the necessities of life . . . ." (§ 2040, subd. (a)(2).) In April 1998, faced with a cash shortage, husband sold certain community property stocks, the proceeds of which he used in part to pay community expenses. Husband did not inform wife or seek court approval of the stock sale before conducting it.

Wife subsequently requested relief on account of the sale, the stock's market price having increased substantially between the sale and the time of trial. In its statement of decision, the court found that husband had violated the restraining order by disposing of the asset, "although the court believes he did not do so maliciously or of ill will." The court noted that husband could have consulted wife, and if she had not agreed to sell he could have sought court approval—but "he did neither." The court therefore ruled that the asset would be valued as if it had not been sold, and that the valuation date for all securities controlled by either party would be the date trial commenced. The outcome was that the judgment awarded wife "Lost appreciation on community property securities valued at $284,087 as of June 24, 1999." The court did not obligate husband for the substantial further appreciation that occurred during the extended trial, a remedy the court eschewed as "an unreasonable penalty on [husband] for his violation of the ATRO . . . ."

Husband nonetheless contends that the award of wife's share of profits lost by his violation of the injunctive order constituted a form of punitive damages, unauthorized and inappropriate for what husband terms "a technical violation" of the order. But the violation could just as well be labeled "a square one."[9] And the remedy imposed was not a form of punitive damages, but rather restitution of the loss caused wife by husband's violation.

In fact, the remedy here precisely paralleled the one provided by section 1101, subdivision (f), for breach of a spouse's fiduciary duty involving asset transfer that impairs the other spouse's undivided one-half interest (see *id.*, subd. (a)). Husband argues that he did not breach such a duty, especially in light of the trial court's finding he did not act maliciously. But the statutory remedy applies to nonmalicious breaches (*In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987, 992 [80 Cal.Rptr.2d 699]), and it was not inappropriate to treat in the same manner husband's violation of an injunctive order designed to preserve the parties' property interests from unilateral disposition.

## II. WIFE'S APPEAL

### A. Spousal Support and Retention of Jurisdiction

Wife raises three issues concerning spousal support: the proper characterization of stipulated payments to her by husband before interim support was

---

[9] As a matter of law, we reject husband's claims that community obligations ipso facto constitute "necessities of life" under section 2040, subdivision (a)(1), or that husband's selling the stock on advice of his business managers, without more, made the sale "in the usual course of business" under that subdivision. Similarly, we cannot accept husband's contention in reply, that the "usual course" exception applied because he had always managed the community property. Such a construction would nullify the plain purpose of the statutory restraining order.

ordered; the proper duration of postjudgment support, which was ordered for two years; and the proper understanding and disposition of the court's order regarding retention or relinquishment of jurisdiction. We address these questions in the order stated.

### 1. *Initial Payments*

Wife filed an order to show cause (OSC) for pendente lite spousal support in October 1997. Among other things, wife declared that during the marriage, husband had provided her $27,500 per month for her personal expenses and those of her Brentwood residence, which she had acquired before the marriage. She also used credit cards, for approximately $5,000 per month, which husband paid.

Wife's OSC was originally set for December 8, 1997, but on December 5 the parties stipulated that it be continued to January 13, 1998. Approved by the court, the stipulation also provided that pending the hearing, husband would pay wife $27,500 on each of December 1 and January 1. Wife also would retain her credit cards, for which husband would pay, but husband would receive credit for expenses charged during any period for which retroactive support (if any) was later ordered. These payments were to be nontaxable to wife and nondeductible by husband. They also were to be without prejudice to the parties' positions regarding wife's needs, based on the marital standard of living and husband's ability to pay.

A similar "Stipulated Order re Interim Payments and Continuance of Hearing Date" was filed on January 13, 1998. It continued the OSC hearing to February 18 and provided, inter alia, for another $27,500 payment to wife, on February 1. This order provided that the payments to wife were not to be taken either "as a measure of pre-separation lifestyle or as establishing [wife's] need for spousal support or [husband's] ability to pay same."

On February 18, 1998, the court ordered further monthly payments, as spousal support. In its ultimate statement of decision, however, the court ruled that husband's payments to wife from July 1, 1997, to March 1, 1998, (the first payment ordered on February 18) were to be characterized not as retroactive support but rather as advances of community property, one-half of which wife had to reimburse husband. The court explained that neither wife nor husband had ever requested that spousal support be granted retroactively from its March 1, 1998 commencement, nor did the stipulations and orders regarding interim payments so provide, the orders having been without

prejudice to characterization. The court stated it had been cognizant of those orders when it directed support on February 18, without ordering retroactivity.

Wife contends that the court's refusal to characterize the interim payments as retroactive support was error, in light of the fact that her need for support during separation was as vital before March 1, 1998, as thereafter. She relies on *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 312 [111 Cal.Rptr.2d 755], which declared that "the trial court's exercise of its discretion regarding retroactivity of temporary support must be guided by two overriding concerns: the supported spouse's need and the supporting spouse's ability to pay." But in this case, no request for or issue of retroactive support was presented when temporary support was ordered. Hence, *Cheriton* is not on point. Moreover, wife's needs were met by the interim payments, which were made without prejudice to spousal support. The trial court's characterization of those nontaxable payments as community property advances was not an abuse of discretion.

### 2. *Permanent Support*

Commencing March 1, 1998, wife was granted and received tax-free pendente lite support of $30,000 per month. Husband paid that amount for 28 months, to July 2000. In its statement of decision and judgment, the court ordered further support, in the same monthly amount (now taxable to wife), for two more years, until July 2002. The judgment declared this duration to be "non-modifiable," and used other language indicating that jurisdiction to extend support further would not be retained. In making this award, the court cited and discussed various factors bearing on a spousal support order, provided in section 4320, which is set forth *post*.[10]

---

[10] "In ordering spousal support under this part, the court shall consider all of the following circumstances: [¶] (a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following: [¶] (1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment. [¶] (2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties. [¶] (b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party. [¶] (c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living. [¶] (d) The needs of each party based on the standard of living established during the marriage. [¶] (e) The obligations and assets, including the separate property, of each party. [¶] (f) The duration of the marriage. [¶] (g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party. [¶] (h) The age and health of the

 Wife contends that the court abused its discretion by limiting her "permanent" support to two years. She does not challenge the monthly amount of support, only its duration. Wife argues that the decision failed to take into account certain of the relevant circumstances set forth in section 4320, and evaluated others insufficiently, or in disregard of the evidence. We review the spousal support award for abuse of discretion, but with the understanding that a sustainable exercise of discretion requires that the trial court have considered and applied all relevant factors under section 4320. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 479–480 [274 Cal.Rptr. 911]; *In re Marriage of Cheriton, supra,* 92 Cal.App.4th at pp. 302–304; see *In re Marriage of Fransen* (1983) 142 Cal.App.3d 419, 425 [190 Cal.Rptr. 885].)

That was not the case here. Strikingly absent from the trial court's analysis was any reference to the fundamental factor of husband's ability to pay support, "taking into account [his] earning capacity, earned and unearned income, assets, and standard of living." (§ 4320, subd. (c).) The closest the statement of decision came to addressing this element was a finding that husband at that time had "gross monthly income of $115,640 . . . ." The court did not address husband's assets, nor did it refer to his earning capacity (although it considered wife's at length). The latter omission seems particularly odd because elsewhere in its statement of decision, on the issue of goodwill, the court documented that husband had developed and possessed an elevated earning capacity. Indeed, in its contemporaneous attorney fees order, the court referred to husband's earning capacity as "enormous."

In *In re Marriage of Cheriton, supra,* 92 Cal.App.4th 269, a similar failure to consider the "key factor" (*id.* at p. 304) of the husband's ability to pay was

---

parties. [¶] (i) Documented evidence of any history of domestic violence, as defined in Section 6211, between the parties, including, but not limited to, consideration of emotional distress resulting from domestic violence perpetrated against the supported party by the supporting party, and consideration of any history of violence against the supporting party by the supported party. [¶] (j) The immediate and specific tax consequences to each party. [¶] (k) The balance of the hardships to each party. [¶] (l) The goal that the supported party shall be self-supporting within a reasonable period of time. Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties. [¶] (m) The criminal conviction of an abusive spouse shall be considered in making a reduction or elimination of a spousal support award in accordance with Section 4325. [¶] (n) Any other factors the court determines are just and equitable." (§ 4320.)

held an abuse of discretion, requiring reversal of a spousal support judgment. The trial court had been aware of the husband's substantial assets, but had not taken them into account. The reviewing court noted that "[i]gnoring the ability to pay is particularly egregious in this case, given the enormous financial disparity between the parties. [Citations.]" (*Id.* at p. 305.)

Yet a second factor that received no explicit attention in the decision below were wife's needs, "based on the standard of living established during the marriage." (§ 4320, subd. (d).) The court found that the marital living standard had consumed community expenditures of $147,000 or $170,000 monthly (respectively exclusive or inclusive of private aircraft costs, which the court deemed business expenses). The court further observed that neither party could presently enjoy that lifestyle. That is a truism in most dissolved marriages. (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 6:947, p. 6-346.) It does not, however, excuse consideration of the supported party's needs under the statute. (*Id.*, ¶ 6:891, p. 6-319.)

Here, the court found husband's current monthly income to be $115,640, or between 68 and 79 percent of the marital lifestyle expenditures. In contrast, wife was receiving "passive income" of $5,777 monthly, and the court found that she had the capacity to earn $11,000 a month (although she had earned no income for two years). Wife's projected present income was thus 14.5 percent of husband's, and hardly one-tenth of the former lifestyle expenditures. Unless the marital standard of living is to be ignored entirely when not fully unattainable, these facts evidenced a question of wife's need, particularly should she not become fully employed. Failure to give direct consideration to that need worked another serious defect in the court's evaluation.

The finding that wife possessed a personal earning capacity of $11,000 per month, or $132,000 annually, was critical to the ruling that permanent support should extend for only two years. (See § 4320, subd. (a).) There were, however, deficiencies in the premises underlying this finding. First, the court noted that wife had been earning $195,000 annually when she married husband. But she had received this income as an executive of a motion picture production company, whereas her employment during the marriage, as well as her intentions after it, more involved acting as an independent producer.

Second, the court found that during the marriage wife had earned an average of $125,000 per year as a producer. However, almost all of the film projects that wife pursued and garnered earnings from during the marriage

also involved husband's participation, in one capacity or another. Wife testified that the few projects on which she worked independently, without husband, together paid her approximately $50,000. The court's finding that wife "has the capability to earn a similar amount that she did during the course of the marriage" thus appears at best uncertain in support. Indeed, in its attorney fees order, the court stated that "[wife's] earning capacity is at this time almost nonexistent."

The court's evaluation of wife's existing and prospective separate property, as a factor affecting the need for support, also appears unnuanced. The statement of decision rather casually reasoned that "someone coming out of divorce [sic] with 5 million dollars, when they entered the marriage with one million dollars has the ability to provide for one's self." This observation did not take into account that wife's assets included her home of many years, nor did it pay regard to the marital standard of living (except to say, once more that both husband and wife were presently living below that lifestyle). Furthermore, the gratuitous comparison of wife's assets before and after the marriage compounded a series of at best irrelevant findings about how wife had benefited from being married to her prosperous husband, and how long it would have taken her to earn her share of the community estate by working her premarital job.

The foregoing deficiencies dictate that the judgment be reversed, insofar as it imposed a two-year limit on permanent spousal support. This disposition is required because of the court's failure to consider and apply the factors of ability to pay and need (§ 4320, subds. (c), (d)), and also because of the evidentiary uncertainty that wife could and would independently support herself, at an appropriate level, within the limited time. On remand, the trial court will be able to assess the proper measure of support to be accorded for the period since June 30, 2002, as well as prospectively, in light of present and intervening circumstances, as well as all relevant statutory factors.

### 3. *Retention of Jurisdiction*

Although wife urges otherwise, the text of the judgment (and also that of the statement of decision) registers the trial court's intention to terminate any jurisdiction to extend spousal support beyond June 30, 2002. Given the holding that permanent spousal support should not have been truncated at that date, reversal or modification of this aspect of the judgment appears essential as a matter of consistency. But even viewed in its original context, the retraction of jurisdiction was overly restrictive, because the court's expectations about wife's capacity to become adequately employed and self-supporting were tentative and untested. Much as in *In re Marriage of Frick*

(1986) 181 Cal.App.3d 997 [226 Cal.Rptr. 766], the circumstances at judgment made it inappropriate for the court then to " ' "burn its bridges," ' " by terminating the "jurisdiction to deal with unforeseen eventualities." (*Id.* at pp. 1021–1022.)[11]

## B. Attorney Fees

Wife's final issues concern the court's assignment of responsibility for paying the approximately $5 million of attorney fees and costs, including experts' fees (hereafter collectively attorney fees), that were incurred by the parties below, particularly the approximately $2 million for wife's representation.

At the time of the orders in question, husband had assumed full responsibility for his attorney fees, much of which he had already paid. He had also paid over $500,000 of wife's fees. The ultimate disposition, about which wife complains, required provisionally that husband pay an additional $850,000 of her fees. This ruling was made in advance of disposition of the parties' Wyoming ranch, perhaps the largest single community asset, which had been listed for sale for over $6 million.

The court's order recited that the court viewed wife's share of that ranch "as the basis for [wife's] separate estate post-marriage and the source of the payment of attorneys' fees and costs." The court also stated that its order for spousal support had "posited that [wife] would have a substantial estate made up of her share of the community estate and her separate property," estimated to amount to a bit over $5 million. Assuming that the ranch sale allowed wife to achieve such a $5 million estate, the court stated, husband would have to pay $850,000 of wife's attorney fees. However, if wife's estate exceeded $5 million, husband's fee obligation would be reduced by one-half of the additional amount. (For example, if wife's estate totaled $6 million, husband's responsibility for the $850,000 fees would be reduced by $500,000, for which wife would be responsible).

Ultimately, this arrangement proved unproductive for wife, as far as fee shifting was concerned. Husband bought out wife's share of the Wyoming ranch, for $2,825,379, and wife's estate as calculated by the court totaled $6,583,795. The judgment therefore reduced husband's attorney fees obligation by $791,897.50, to $58,102.50. Moreover, because husband had already advanced $200,000 for wife's fees (when the proceeds of sale of another ranch were deposited with wife's trial attorneys), the judgment allowed him a

---

[11] Although *In re Marriage of Frick* involved a marriage of two months more than 10 years (see § 4336), that was not the linchpin of the decision's analysis and conclusion of reversal.

net credit of $141,897.50, to be taken against the judgment's equalization payment to wife (originally $1,022,613 but now $880,715.50).

 Wife contends that use of what the court termed the "$5 million benchmark" was unfounded and improper, and that even if not, the court miscalculated wife's assets and thus misapplied the benchmark. We review a matrimonial attorney fees order for abuse of discretion. (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768–769 [209 Cal.Rptr. 354, 691 P.2d 1020].)

Wife first argues that there was no evidentiary or other rationale for pivoting husband's responsibility for her fees on the $5 million measure of assets. Wife relies primarily on *In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877 [69 Cal.Rptr.2d 480]. There the court rejected the argument that a spouse had not shown need for an award of attorney fees because those fees represented only 25 percent of his assets. Observing that under section 2032, an ability to pay one's own fees was not a bar to their award, the court stated that the Legislature had not "intended to endorse any fixed measure or percentage as a way to demonstrate need or the lack thereof," and that the statute "eschew[ed] any notion that a numerical standard should be applied." (*O'Connor*, at p. 883.)

Contrary to wife's contention, the court's order and judgment reflect a defensible rationale for choosing the $5 million amount, namely the court's prior resolve to afford wife a full $5 million estate. And the court's positive focus on wife's situation was part of the consideration of assets and ability to pay, which wife contends was absent. We cannot say that the court's disposition was an abuse of discretion, that is, one that " 'no judge could reasonably make.' " (*In re Marriage of Sullivan, supra*, 37 Cal.3d at p. 769.)

Wife further contends that even if her estate value was a proper basis for disallowing recovery of some fees, the court included in that estate several items that should not have been so included. The first of these was $402,000 from the smaller ranch's sale, which had gone directly to the attorneys. We see no reason, however, why the court could not define wife's estate as including funds that were used to defer existing expenses, even though she never physically possessed those funds. The same holds true with respect to the judgment's equalization payment. Wife also complains about the inclusion of about $1.5 million of nonliquid assets, arguing that they could not readily be spent for attorney fees. (Cf. *In re the Marriage of Kerry* (1984) 158 Cal.App.3d 456, 464 [204 Cal.Rptr. 660].) But the court was assessing wife's entire base of assets, not just what was available for fees.

Wife finally argues that by forcing her to pay about $795,000 of the attorney fees husband originally was to pay, the trial court self-contradictorily

diminished the very estate on which it relied to justify her limited spousal support. But in that connection, as in this one, the court had estimated an estate of $5 million, and the attorney fees order did not infringe that amount at all.

In view of our conclusion that there is, as a matter of law, no such asset as goodwill in husband's profession as a motion picture director, wife's estate is necessarily diminished by $750,000. This requires a recalculation of attorney's fees under the formula adopted by the trial court, which we affirm. Under that formula, husband's obligation for attorney fees is reduced by $416,897. We remand the matter for a modification of the judgment on the amount of attorney fees and the credit against the equalization payments to wife.

## DISPOSITION

The judgment is reversed insofar as it limits to June 30, 2002, the obligation to pay spousal support and the court's jurisdiction to enlarge or extend such support. The superior court shall enter judgment retaining such jurisdiction, and providing for spousal support payable by husband to wife for the period commencing July 1, 2002, and continuing as warranted. The judgment is to be modified by deleting $1.5 million in assets, denominated as goodwill, from property that is subject to division. The judgment is also to be modified as to the amount of wife's attorney fees to be paid by husband, and the credit against the equalization payments. In all other respects, the judgment is affirmed. Wife shall recover costs on both appeals.

**BOLAND, J.,** Concurring.—I concur in the judgment and write separately to state the rationale I believe justifies the conclusion that, as a matter of law, John McTiernan's work as a movie director is not a business or professional practice to which goodwill may attach.

Let me begin with several points on which there is no dispute.

First, goodwill may exist in a professional practice or in a business which is founded upon personal skill or reputation. (*In re Marriage of Foster* (1974) 42 Cal.App.3d 577, 582, fn. 2 [117 Cal.Rptr. 49].)

Second, the goodwill of a business is property and is transferable. (Bus. & Prof. Code, § 14102.) Otherwise stated, goodwill is an asset of a business or professional practice, and where the business or professional practice is community property, it is a community asset. (*Golden v. Golden* (1969) 270 Cal.App.2d 401, 405 [75 Cal.Rptr. 735].)

Third, "[a]lthough the goodwill of a business may be the result of the personal skill, talent, experience, or reputation of an individual connected with the business, it may attach to and continue with the business even after the separation of the individual on whom it was founded." (*Smith v. Bull* (1958) 50 Cal.2d 294, 302 [325 P.2d 463].)

Fourth, "[w]hen goodwill attaches to a business, its value is a question of fact." (*In re Marriage of King* (1983) 150 Cal.App.3d 304, 309 [197 Cal.Rptr. 716].)

From these well-settled points, two other principles seem clear:

—Goodwill, as a divisible asset, does not exist apart from the business or professional practice to which it attaches.

—Because it is property, any business or professional practice (along with any goodwill attached to it) is and must be, at least in legal theory, transferable from one person or entity to another. (See *Yuba River Power Co. v. Nevada Irr. Dist.* (1929) 207 Cal. 521, 523 [279 P. 128] [citing a definition of the term "property" as " 'sufficiently comprehensive to include every species of estate, real and personal, and everything which one person can own and transfer to another' "]; see also *Douglas Aircraft Co. v. Byram* (1943) 57 Cal.App.2d 311, 317 [134 P.2d 15] ["[a] common characteristic of a property right, is that it may be disposed of, transferred to another"]; *Bias v. Ohio Farmers Indemnity Co.* (1938) 28 Cal.App.2d 14, 16 [81 P.2d 1057] ["it is a fundamental principle of law that one of the chief incidents of ownership in property is the right to transfer it"].)

Accordingly, in the first instance, the question is whether McTiernan—or, more properly, the marital community—owned a business or a professional practice to which goodwill could attach. In my view, the answer is no, because McTiernan cannot—even in theory—sell or otherwise transfer his "professional practice" or "business" to a third party. This is not because there is no market for the business, but for the more fundamental reason that nothing exists to sell. McTiernan has only his talent as a director, and he cannot transfer it to anyone else. In this, he is no different from any other artist, entertainer or athlete with a talent that commands high compensation. While the occupations of these individuals, like most other occupations, are in common parlance denominated "professions," they are neither businesses nor professional practices that can be expanded beyond the individual in whom the talent resides. Unlike a doctor, lawyer, accountant or other business person, McTiernan cannot hire someone else to direct a movie he has been hired to direct. He cannot expand his "practice" or "business" because he has only his own artistic talent to offer. Whatever we may call it—talent,

occupation, livelihood or profession—the creative processes of a movie director, like that of any other artist, cannot be bought, sold or given away, and therefore do not fit within any recognized definition of property. Consequently, no business or professional practice constituting property exists in McTiernan's case, within the meaning of current statutory or case law. Goodwill as statutorily defined, as merely an intangible asset of a business or professional practice, necessarily cannot exist in the absence of a business or professional practice.

The conclusion that, as a matter of law, McTiernan has no business or professional practice to which goodwill could attach is not a departure from California precedents on professional goodwill. Our dissenting colleague concludes that *In re Marriage of Watts* (1985) 171 Cal.App.3d 366 [217 Cal.Rptr. 301] and *In re Marriage of Foster, supra,* 42 Cal.App.3d 577 teach that "professional goodwill" need not be susceptible to transfer to another in order to be a divisible community asset. I do not so read either case. Both *Foster* and *Watts* involved medical practices, and there is no question that medical practices, including sole proprietorships, can be and are bought and sold. Specifically:

—In *Foster*, as the court observed, "the parties apparently concede that a medical practice has a goodwill and that such goodwill has a value." (*In re Marriage of Foster, supra*, 42 Cal.App.3d at p. 581.) The issue in *Foster* was whether a proper method of evaluating goodwill was used. *Foster* stands for the proposition that the value of professional goodwill in a marital dissolution is not necessarily its market value. The court held that "[t]he value of community goodwill is not necessarily the specified amount of money that a willing buyer would pay for such goodwill." (*Id.* at p. 584.) *Foster* explained: "In view of exigencies that are ordinarily attendant a marriage dissolution the amount obtainable in the marketplace might well be less than the true value of the goodwill." (*Ibid.*) Thus, *Foster* assumes that the sale of a medical practice is possible, and indeed we know this from our common experience in the business and professional world.

—In *Watts*, the court similarly rejected the notion that market value is the only method of evaluating the goodwill in a medical practice, citing the analysis in *Foster*. The husband's experts in *Watts*, utilizing the market value or comparable sales method of valuation, concluded there was no goodwill in the husband's medical practice because no market existed for the practice. (*In re Marriage of Watts, supra*, 171 Cal.App.3d at p. 369.) The court found that the trial court's factual findings were in conflict with each other, and if the trial court had employed the capitalized excess earnings method of valuing the goodwill of a medical practice, a monetary value would have resulted. (*Id.* at p. 371.) The court concluded that, in the dissolution of

marriage context, "the mere fact that a professional practice cannot be sold, standing alone, will not justify a finding that the practice has no goodwill nor that the community goodwill has no value." (*Id.* at p. 372.) This conclusion was quite proper, and is not in conflict with the principle that no business or professional practice exists where nothing can be transferred to a third party. Many reasons may exist why a professional practice "cannot be sold"—at a particular time, in a particular place, or under particular circumstances. But medical practices, law practices, and all other businesses are, in legal and economic terms, amenable to purchase and sale. McTiernan's work—his talent or livelihood—like that of any other artist or athlete, is not.

A few additional observations are in order.

First, I recognize that the existence and value of goodwill in a business are questions for the trier of fact. (*Smith v. Bull, supra,* 50 Cal.2d at p. 306 ["whether the business possessed a goodwill is also a question of fact"]; see *In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 817 [130 Cal.Rptr.2d 1] [no goodwill existed in husband's law practice; the trial court's finding that law practice was worth $60,500, of which $42,000 constituted goodwill, was reversed with instructions to assign a goodwill value of $0].) In this case, however, transferable goodwill, by statute, exists only in a business or professional practice, and McTiernan, as a matter of law, has no goodwill because he has no transferable business or professional practice.

Second, I likewise understand that some cases recognize the goodwill a lawyer possesses as an individual, even though the lawyer practices as a partner in a firm, and by agreement holds no entitlement to the goodwill of the law firm. (*In re Marriage of Iredale & Cates* (2004) 121 Cal.App.4th 321, 329 [16 Cal.Rptr.3d 505]; see also *In re Marriage of Fenton* (1982) 134 Cal.App.3d 451, 461 [184 Cal.Rptr. 597] [value of the goodwill in husband's law corporation was not controlled by the amount a shareholder in the corporation was entitled to receive on withdrawal or termination].) These cases merely recognize that the form in which a professional practice is carried on does not control the valuation of the goodwill that attaches to the individual's professional practice, which would exist "whether he stays with his firm or strikes out on his own." (*Fenton, supra,* 134 Cal.App.3d at p. 463; see also *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 673, fn. 4 [33 Cal.Rptr.2d 13] [husband with shareholder interest in law firm "has personal goodwill regardless of whether he remains with the firm, and this goodwill cannot be eliminated by a recital in the stock purchase agreement"].) These cases do not suggest that any individual, regardless of occupation, possesses transferable goodwill simply because he or she is highly compensated in comparison with his or her peers. In each case, the underlying professional practice or business in which the individual is engaged is susceptible in legal

and economic theory of being changed in form, expanded, bought and sold. None of those attributes adhere to McTiernan's activity as a movie director.

Finally, I return to the words of *Smith v. Bull, supra,* 50 Cal.2d at page 302, which plainly demonstrate that goodwill is not a divisible asset unless it can be transferred from the person who created it. As the Supreme Court observed, "[a]lthough the goodwill of a business may be the result of the personal skill, talent, experience, or reputation of an individual connected with the business, it may attach to and continue with the business even after the separation of the individual on whom it was founded." (*Ibid.*) In this case, McTiernan cannot be separated from his "business," either practically or theoretically.

In short, the Legislature has defined goodwill as property only in connection with a business, and it has specified that the goodwill of a business is transferable. Where there is no transferable business, there is no property to divide, and there is necessarily no goodwill. The Legislature, of course, is at liberty to define goodwill in a more expansive manner, so that it would include the ability of an artist or entertainer to generate excess earnings by virtue of his or her talent and the resulting encomium of a receptive public. It has not yet done so, and it was therefore error for the trial court to conclude that McTiernan possessed professional goodwill that was a divisible community asset.

**COOPER, P. J.,** Concurring and Dissenting.—I concur in the lead opinion and in the judgment with respect to all issues but one. I respectfully dissent from my colleagues' conclusion that husband has no divisible goodwill. The facts found by the trial court establish that husband possesses valuable goodwill, as traditionally recognized by California case law. In holding otherwise as a matter of law, the majority apply restrictive concepts that disregard established family law precedent. Moreover, even under this legal revision, substantial evidence still supports the trial court's findings that husband possessed goodwill in his professional business, in which wife was entitled to share.

Business and Professions Code section 14102 declares the goodwill of a business to be property, albeit intangible. Section 14100 of the same code compactly defines goodwill as "the expectation of continued public patronage." The United States Supreme Court has similarly stated, "Although the definition of goodwill has taken different forms over the years, the shorthand description of goodwill as 'the expectancy of continued patronage' [citation] provides a useful label with which to identify the total of all the imponderable qualities that attract customers to the business." (*Newark Morning Ledger Co. v. United States* (1993) 507 U.S. 546, 555–556 [123 L.Ed.2d 288, 113 S.Ct. 1670].)

In California, spousal goodwill is uniformly recognized as subject to assessment and award in proceedings for division of community property. (See 11 Witkin, Summary of Cal. Law (9th ed. 1990) Community Property, § 69, pp. 461–462.) "Although community goodwill is usually associated with a professional practice, it may exist in any business which is founded upon personal skill or reputation." (*Id.* at p. 461.) Both the existence and the value of goodwill in a particular case are questions of fact, and their determination is reviewed on appeal under the substantial evidence test. (E.g., *Smith v. Bull* (1958) 50 Cal.2d 294, 306 [325 P.2d 463]; *Mueller v. Mueller* (1956) 144 Cal.App.2d 245, 252 [301 P.2d 90] (*Mueller*); *In re Marriage of Slivka* (1986) 183 Cal.App.3d 159, 162 [228 Cal.Rptr. 76].)

Previous decisions have attributed goodwill to a variety of professional individuals and situations, including an attorney who worked at home on appointed criminal appeals (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808 [130 Cal.Rptr.2d 1]), a computer consultant who worked at home or at his clients' facilities, with "no plant, no commercial location, no employees, and [no] office" (*In re Marriage of King* (1983) 150 Cal.App.3d 304, 310 [197 Cal.Rptr. 716]), and a law firm partner who was found to possess professional goodwill as an individual (*In re Marriage of Iredale & Cates* (2004) 121 Cal.App.4th 321 [16 Cal.Rptr.3d 505]; accord, *In re Marriage of Fenton* (1982) 134 Cal.App.3d 451, 463 [184 Cal.Rptr. 597]; see *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 673, fn. 4 [33 Cal.Rptr.2d 13]).

In the present case, husband's business and profession were that of a motion picture director. The trial court found, after assessing extensive evidence, that husband possessed professional goodwill of a value of $1.5 million. Because all of this value had developed during the parties' marriage, wife was entitled to a compensatory payment of $750,000.

The majority now set aside these findings by superimposing on the concept of marital goodwill a novel set of elements. In brief, the majority opine that a professional individual such as husband may not possess goodwill without having a "business" (which husband supposedly did not have), and that there can be no goodwill unless it, or the accompanying business, can be sold (which husband's allegedly cannot). These artificial restrictions are legally unfounded and factually inaccurate; moreover, even were they correct, they would provide no cause for reversing the award of goodwill in this case as a matter of law.

The lead opinion's effort to limit goodwill to a "business" as opposed to an individual is semantic. Any professional who independently practices his or her profession, for profit—be it lawyer, doctor, computer consultant, or film

director—thereby conducts a business, within the lead opinion's own unattributed definition, as well as more traditional ones.[1] It is therefore neither factually nor legally correct to say that only a business, and not a natural person, may generate or possess goodwill. When the consultant in *In re Marriage of King, supra,* 150 Cal.App.3d 304, and the lawyers in *In re Marriage of Rosen, supra,* 105 Cal.App.4th 808, and *In re Marriage of Iredale & Cates, supra,* 121 Cal.App.4th 321, generated goodwill while practicing their professions, they did so as individuals.[2]

But whichever view one takes of this issue, it cannot properly oust husband and wife of the palpable, valuable goodwill that the trial court found husband had developed. By any realistic understanding, husband earned his professional compensation, and developed an expectation of continued patronage, while practicing a business, of directing motion pictures. This business comprised not just husband's talent, but a series of corporations, one of which owned an airplane, which husband used to travel to and scout film locations. Husband had as much a "business" as the professionals in the cases last cited.

The second disqualifying element, in the majority's view, is the notion that husband's goodwill was not transferable. This too is not a valid ground for reversing the present findings and award for goodwill.

The lead opinion's treatment of this subject rests substantially on the incorrect perception that husband's goodwill, as found below, consisted of the "elite professional standing" the trial court found he enjoyed. But the finding of "elite standing" was only prefatory to the ultimate finding that husband possessed goodwill, in the court's words, "an expectation of continued patronage at his prior level of compensation." (Cf. Bus. & Prof. Code, § 14100.)

As for whether this goodwill is transferable and therefore qualifies as property, the short answer is that the law has determined both questions. Business and Professions Code section 14102 establishes, as a matter of law, that "The good will of a business is property and is transferable." That includes the goodwill of husband's business as a director. Whether or not a

---

[1] Thus, Webster's Third New International Dictionary (1993), page 301, defines "business" as "a commercial or industrial enterprise," and then immediately offers as an example, "he's in [business] for himself . . . ." The denotation does not include the lead opinion's element of "with assets."

[2] The notion that compensating for an individual's goodwill would create liabilities that might not be recoverable is also unrealistic. Assessments and valuations of goodwill, as in this case, take into account the individual or other business's apparent prospects, negative as well as positive. Any such assessment, whether for a doctor or a delicatessen, is a "predictio[n] about earning capacity" (lead opn., *ante,* at p. 1099), based on prior experience.

third party is willing to buy it is not material. (Accord, *In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 372 [217 Cal.Rptr. 301].)

There is a reason why the existence of goodwill in a marital context does not depend upon the practical transferability of the professional spouse's practice. Insofar as it is assessed and disposed of in a judicial proceeding upon dissolution of the marriage, goodwill is not a commodity in the marketplace, but rather "a portion . . . of the professional practice as a going concern on the date of the dissolution of the marriage." (*In re Marriage of Foster* (1974) 42 Cal.App.3d 577, 584 [117 Cal.Rptr. 49] (*Foster*).)

*Foster* further explained, "As observed in *Golden* [*v. Golden* (1969) 270 Cal.App.2d 401, 405 [75 Cal.Rptr. 735]], '. . . in a matrimonial matter, the practice of the sole practitioner husband will continue, with the same intangible value as it had during the marriage. Under the principles of community property law, the wife, by virtue of her position of wife, made to that value the same contribution as does a wife to any of the husband's earnings and accumulations during marriage. She is as much entitled to be recompensed for that contribution as if it were represented by the increased value of stock in a family business.' " (*Foster, supra,* 42 Cal.App.3d at p. 584.) Accordingly, *In re Marriage of Watts, supra,* 171 Cal.App.3d 366, disposed of the notion that transferability as a practical matter is a prerequisite of a business with goodwill: "In the dissolution of marriage context, the mere fact that a professional practice cannot be sold, standing alone, will not justify a finding that the practice has no goodwill nor that the community goodwill has no value." (*Id.* at p. 372.)

Acknowledging that goodwill is transferable by law, the concurring opinion yet pursues the question of transferability, by asserting that husband cannot sell or transfer his professional business, because "nothing exists to sell." (Conc. opn. of Boland, J., *ante,* at p. 1112.) As just explained, this would not be dispositive, even if correct. But the concurrence's assertion that husband's business is not amenable to sale or transfer is a supposition, grounded not in the record of this case but in speculation, about a business and craft that we appellate jurists know very little about.[3] This is not a proper basis for reversal.

---

[3] Thus, although irrelevant, it is by no means certain that husband could not procure someone else to direct one of his films. For example, John Frankenheimer replaced Arthur Penn as director of The Train (United Artists 1964), Otto Preminger replaced Rouben Mamoulian as director of Laura (20th Century Fox 1944), and Victor Fleming succeeded George Cukor as director of Gone With the Wind (Metro-Goldwyn-Mayer 1939). (See, respectively, <http://imdb.com/title/tt0059825/fullcredits#directors> [as of Oct. 28, 2005], <http://imdb.com/title/tt0037008/fullcredits#directors> [as of Oct. 28, 2005], and <http://imdb.com/title/tt0031381/fullcredits#directors> [as of Oct. 28, 2005].)

In this case the trial court properly determined the existence and extent of husband's goodwill, in accord with substantial evidence and with California law, as consistently expounded for half a century. Even under the majority's refashioning of that law, those determinations remain sustainable. I respectfully dissent.

The petition of appellant Donna Dubrow for review by the Supreme Court was denied January 25, 2006, S139403.