Filed 6/24/14  Marriage of  Crews CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of KELLY L. and MICHAEL D. CREWS. | |
| | D060973 |
| KELLY L. CREWS, | |
| Appellant, | (Super. Ct. No. DN147426) |
| v. | |
| MICHAEL D. CREWS, | |
| Appellant. | |

APPEALS from a judgment of the Superior Court of San Diego County, Thomas Ashworth III, Judge.  Reversed in part and remanded with directions; affirmed in part.

Law Offices of Mary A. Lehman and Mary A. Lehman; Law Offices of David M. Meyer and David M. Meyer for Appellant Kelly L. Crews.

Stephen Temko for Appellant Michael D. Crews.

In this marital dissolution action between Michael D. Crews and Kelly L. Crews, both parties appeal from a judgment on reserved issues determining the division of property and other matters, including child and spousal support.[1] Michael contends in his appeal that (1) the support orders should be reversed because there was insufficient evidence to support the court's imputation of income to him; (2) there was insufficient evidence to support the court's business goodwill valuation; (3) the court abused its discretion in valuing the parties' corporate jet airplane on the date of separation instead of the date of trial; and (4) the court abused its discretion by dividing the community estate unequally. In her appeal, Kelly contends the court erred by failing to enforce certain provisions in the parties' postmarital agreement (PMA), which provided for the division of property in the event one of the parties filed for dissolution. Kelly also requests that this court award her attorney fees on appeal.

We conclude that the court erred in imputing income to Michael, valuing and awarding goodwill to Michael, and dividing the community estate. We further conclude that the court effectively found that Michael breached the PMA but did not determine the proper remedy for the breach.

---

[1] As is customary in family law cases, we will refer to the parties by their first names for convenience and clarity, intending no disrespect.

FACTUAL AND PROCEDURAL BACKGROUND

Michael and Kelly were married in March 1998. They had two children during the marriage—a daughter born in 2000 and a son born in 2003. In July 2007, Kelly filed a petition for legal separation, and Michael filed a response in which he requested dissolution of the marriage. The parties stipulated that retired Judge Thomas Ashworth, III would serve as judge pro tem in the dissolution proceedings. They also stipulated to the appointment of Tony Yip, CPA, as the court's expert under Evidence Code section 730 to appraise their business interests and analyze their incomes for purposes of determining child and spousal support. The court entered a status-only judgment of dissolution in January 2008.

At the time of the marriage, Michael was a real estate developer who built homes under the business name Michael Crews Development (MCDI). By the time of trial, he had been in the real estate development business for 29 years. Shortly before they were married, Michael and Kelly started and incorporated a new real estate development company named Michael Crews Development II (MCDII). Michael and Kelly each owned 50 percent of the shares of MCDII and were the initial directors and officers of the corporation. They each contributed $40,000 to the new corporate entity and MCDI loaned it another $1 million. Kelly ran MCDII's marketing department and Michael ran the rest of the business. The company grew steadily and repaid the loan from MCDI. MCDII's sales were about $17 million in 2002 and $39 million in 2005. Its debt increased over the years as well, growing from $6.4 million in 1999 to $25 million in

2004.  In 2006 MCDII owed $26 million in construction loans and its sales decreased to $29 million.

Michael and Kelly's income also grew between 1999 and 2005.  Their adjusted gross income in 1999 was about $1.5 million.  In 2004 it was $12.4 million and in 2005, the year the real estate market in San Diego peaked, it was $18.9 million, including a one-time capital gain of $8.6 million on the sale of a tract of land.  However, in 2006 their adjusted gross income fell to $5.3 million.

Michael and Kelly lived an affluent lifestyle during their marriage.  In November 2003 MCDII bought a corporate jet airplane, which Michael and Kelly frequently used for personal travel and entertaining.  In November 2010, close to the time of trial, the broker who sold the airplane to MCDII appraised it at $650,000.  Another appraisal done in November 2010 valued the airplane at $548,533.

In February 2005, Michael and Kelly entered into a written PMA.  Among other things, the PMA provided that all of the parties' real and personal property was deemed to be their community property, regardless of when or how it was acquired or whether title was in the name of one party, both parties, or a business.  In the event one of the parties filed for dissolution of the marriage, the PMA specified separate property distributions that were to "forthwith occur . . . ."  The agreement provided that Michael could unilaterally transfer $5 million from the community estate to himself as separate property, and Kelly could unilaterally transfer $126,000 from the community estate to herself as separate property.  The PMA then stated:  "Neither party shall have any other claim for a separate property contribution to the community, nor shall either party be

4

entitled to any separate property reimbursements from the community, whether statutory or otherwise."

After Michael filed for dissolution, he claimed the PMA was invalid. However, through counsel in October 2008, he sent Kelly and the court correspondence stating he had concluded the PMA was valid and designating $5 million in assets he wanted to receive as his separate property under the PMA. The correspondence included a declaration entitled "Abandonment of Contest of PMA Upon Payment of $5,000,000 million Plus Interest . . . ." Kelly filed a motion to restrain transfer of any assets to Michael pending trial. The court granted the motion and ruled that distribution of property under the PMA was an issue for trial.

In October 2007, the court ordered joint legal and physical custody of the children to Michael and Kelly with a 50 percent time share. The court ordered that MCDII was to pay Michael and Kelly each $60,000 per month as family support. However, the court retained jurisdiction to "retroactively allocate support among child support and spousal support and . . . to make a de novo determination of the support itself because the Court . . . is uncertain what the report of Tony Yip, C.P.A., will indicate about income."

The court further ordered that Michael was prohibited from using the parties' personal assets "to recapitalize or infuse into the business without the informed consent of [Kelly]." The court directed that Kelly could not arbitrarily refuse Michael's reasonably justified requests for personal asset contributions into the business, but she was to "be provided with the necessary disclosure concerning the request so that she

5

through her advisors [could] make a well considered and informed decision as to the request."

At a hearing in January 2008, the court decided that giving Michael the management and control of the parties' business interests and community estate was the best way to maximize the community estate pending trial. At subsequent hearings the court reiterated its view that the success of the business was "anchored in one person only, and that is [Michael]. . . . He's either going to sink [or] swim. He's going to succeed or fail." Thus, the court decided that it was "going to give [Michael], as long as this case is pending, until we get to a conclusion, the benefit of the doubt in terms of operating this business and spending money to keep it going." During the course of the pretrial proceedings, the court authorized Michael to use community assets for various business purposes, including paying down loans, partnership payments, and paying other bills and expenses. On appeal, Kelly claims that Michael received approximately $14 million in community property assets between the date he filed for dissolution and trial, in addition to the $5 million in community property assets he elected to take as his separate property under the PMA.

In May 2009, a bifurcated trial was held on the issues of child custody and child sharing only, and in November 2009, the court entered judgment on those issues. The court awarded sole legal custody of the children to Michael, but awarded Michael and Kelly joint physical custody with a 50 percent time share.

Trial on the remaining issues was held over nine days in December 2010. In August 2011 the court filed a "Final Statement of Decision On Reserved Issues." On September 30, 2011 the court entered judgment on the issues addressed in the statement of decision. We will include additional relevant facts in our discussion of the legal issues.

DISCUSSION

*MICHAEL'S APPEAL*

I. *Determination of Michael's Income for Purposes of Support*

A. <u>Imputation of Income</u>

Michael contends the support orders in the judgment should be reversed because there was insufficient evidence to support the court's imputation of income to him. The court ordered Michael to pay child support of $2,778 per month and spousal support of $1,750 per month. It found Michael had "imputed self-employment income of $12,500 per month" and unearned taxable income of $9,000 per month from rental of the La Terazza property, a commercial building that the court awarded to Michael from the community estate.

The court explained its imputation of income as follows: "[Michael] was able make a profit of approximately $1.1 million on rebuilding some fire victims' homes and another $100,000 on [another] project, for a total of $1.2 million. Assuming a reasonable 50% overhead cost, [Michael] generated approximately $600,000 after all expenses. . . . The $600,000 . . . was the total net business income over the approximately 4 years from the building recession to trial. Averaged over this period,

7

[Michael] was able to earn $150,000 annually. In the absence of any better information, the Court finds that [Michael] has the ability to earn $150,000 annually from self employment."

We review a child support order for abuse of discretion and, in doing so, determine whether substantial evidence supports the factual findings made in connection with the order. (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 730.) Similarly, we review spousal support orders for abuse of discretion and "examine the challenged order for legal and factual support. 'As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it.' " (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1443.)

Family Code[2] section 4058, subdivision (b) provides that in determining child support, "[t]he court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children." Section 4320, subdivision (a) requires the court in ordering spousal support to consider, among other circumstances listed in the statute, "[t]he extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage . . . ." " 'It has long been the rule in this state that a parent's earning capacity may be considered in determining spousal and child support.' " (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 301.)

---

2    All subsequent statutory references are to the Family Code unless otherwise specified.

" 'Earning capacity is composed of (1) the ability to work, including such factors as age, occupation, skills, education, health, background, work experience and qualifications; (2) the willingness to work exemplified through good faith efforts, due diligence and meaningful attempts to secure employment; and (3) an opportunity to work which means an employer willing to hire . . . . [¶] . . . When the ability to work or the opportunity to work is lacking, earning capacity is absent and application of the standard is inappropriate.' " (*Mendoza v. Ramos* (2010) 182 Cal.App.4th 680, 685.) "[I]n the case of professionals or tradespeople who are self-employable, the 'employer willing to hire' definition [of 'opportunity to work'] is obviously too narrow, as it encompasses only salaried employees." (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 930.) In such cases, "a more appropriate definition of 'opportunity to work' is the substantial likelihood that a party could, with reasonable effort, apply his or her education, skills and training to produce income." (*Ibid.*)

"The party seeking to have income imputed bears the burden of demonstrating [ability and] opportunity to earn that income: the burden 'cannot be met by evidence establishing merely that a spouse continues to possess[] the skills and qualifications that had made it possible to earn certain salary in the past . . . .' " (*Mendoza v. Ramos*, *supra*, 182 Cal.App.4th at p. 685.) " 'Figures for earning capacity cannot be drawn from thin air; they must have some tangible evidentiary foundation.' [Citation.] 'To calculate support based on the hypothetical procurement of a job which the evidence showed was not available to [the parent] would effectively write the "opportunity" element of earning capacity out of existence.' " (*In re Marriage of Smith* (2001) 90 Cal.App.4th 74, 82.)

9

We conclude the court's imputation of income to Michael was erroneous because it was based on the unwarranted assumption that he would earn the same substantial income in the immediate future that he was able to average over the preceding four years by rebuilding homes destroyed in the catastrophic October 2007 fires in San Diego County, even though the real estate development market had crashed and not yet recovered. In *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, the Court of Appeal disapproved imputation of income based on past income that the husband had earned as a commissioned investment salesperson but was unlikely to earn in the immediate future. The *Riddle* court stated: "[W]e must reject the idea that just because there were years in the late 1990's in which Husband earned about $300,000 as a commissioned investment salesperson . . . Husband could earn the same amount in early 2003 when [the support] order was made. *This is the logical fallacy of extrapolation, in which some series of events in the past is necessarily assumed to continue in exactly the same way into the future.* Pretty much every sentient adult in the United States knows that the stock market did not continue to go up in the early 2000's the way it had in the late 1990's." (*Riddle*, *supra*, at p. 1086, italics added.)

Likewise, the real estate development market had not recovered when the court imputed income to Michael based on past projects. The court acknowledged in its statement of decision that "[d]uring the entire pendency of this case, the building industry was in crisis[,]" and that the drastic reduction in the community estate after separation "was caused by the free-fall in real estate development[.]" The court also recognized that for the preceding four years Michael had been "attempting to reduce and

10

restructure debt in a very difficult economic environment. The goal has been to bring the parties' business interests in for a 'soft landing,' and salvage some of their assets." The court found: "[Michael's] estimate of another year to complete this process is realistic. Also, his estimate of another 3 to 5 years for home building to recover could well be correct. [¶] [Michael] generally did not start new projects after separation and either abandoned the ones in progress or completed them without a profit. Any money received was either distributed to the parties or used to operate the businesses while they were being wound down."

As noted, the court found that the $600,000 profit Michael earned from rebuilding fire victims' homes "was the total net business income over the approximately 4 years from the building recession to trial." Thus, the statement of decision shows that Michael's prospects of earning income from home building in the immediate future were slim. Although he had the good fortune of being able to earn money by rebuilding homes for fire victims when the building industry was in crisis, there was no evidence or finding that he would have future opportunities to earn money by rebuilding homes for fire victims or performing other building contracts. Thus, the court's imputation of income to Michael "[i]n the absence of any better information," reflects the logical fallacy of extrapolation – i.e., the assumption that Michael would continue to earn approximately $150,000 per year rebuilding homes for fire victims. The court's assumption is not supported by evidence in the record. It is not appropriate to base a support order on future income that is not guaranteed and then require the paying spouse to file motions to modify the support when the future income is less than the court

11

assessed.  (*In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375, 1387.)  Accordingly, we will reverse the judgment's child and spousal support awards and direct the trial court to recalculate the awards for the relevant time period without imputing income to Michael.

B. Rental income

In addition to imputing self-employment income of $150,000 per year to Michael for purposes of determining income available for support, the court based its support determinations on the finding that Michael received unearned taxable income of $9,000 per month from rental of the La Terazza property.  Michael contends the court erred by not offsetting that amount by the negative cash flow or monthly "carrying costs" he realizes from three other properties, which he identifies as Valley View Commerce Center, LLC with "cash flow needs" of $1400 per month; MLA Partners, LLC with cash flow needs of between $800 and $1,200 per month; and Banning Office Building, LLC with cash flow needs of between $470 and $640 per month.[3]

---

[3]    Kelly argues the court was not required to deduct Michael's expenditures on other properties from his rental income from the La Terazza property because the court rejected the use of Michael's *actual* income to calculate support by expressly stating it was *imputing* income to Michael.  However, in its statement of decision, the court did not *impute* the rental income to Michael; it imputed only the $150,000 annual income that it found Michael had the capacity to earn, stating Michael "has the ability to earn $150,000 annually from self employment."  The court then separately found:  "*In addition*, [Michael] will be receiving $9,000 in net monthly rental income since he is being awarded the La Terazza commercial property, which is the parties' only income-producing asset."

12

There is merit to Michael's argument that monthly rental income used to calculate a spouse's gross income for purposes of support is properly offset by monthly losses the spouse carries from other properties. Section 4058, subdivision (a)(1) includes rent as a source of annual gross income, and section 4058, subdivision (a)(2) includes "[i]ncome from the proprietorship of a business, such as gross receipts from the business *reduced by expenditures required for the operation of the business*." (Italics added.) However, on appeal Michael has not adequately established the amount of any particular offset to which he may be entitled as a result of negative cash flow from an investment property. Court appointed appraiser Yip's final report and the judgment identify the three properties in question as assets partly owned by the MCDI Pension and Profit Sharing Plan,[4] and show that the properties have a negative value. Under the heading "Retirement and Pensions," the judgment awards MCDI Pension and Profit Sharing Plan's interest in those properties to Michael. However, neither the judgment nor Yip's final report shows the amount of the monthly negative cash flow from these properties. In proceedings on remand to determine the proper amount of Michael's support obligations, Michael is entitled to present evidence of his monthly carrying costs on any real property assets awarded to him and to argue that the court, in its discretion, should offset his rental income from the La Terazza property in the amount of those costs.

---

[4]     The judgment states that MCDI Pension and Profit Sharing Plan owns a 33.33 percent interest in Valley View Commerce Center, LLC; a 30 percent interest in MLA Partners, LLC; and a 50 percent interest in Banning Office Building, LLC.

## II. *Goodwill Valuation*

Michael contends there was insufficient evidence to support the court's valuation of business goodwill at $474,000. We agree.

The family court is obligated to value and divide the community estate of the parties equally, including the value of the goodwill of any community asset. (*In re Marriage of Greaux and Mermin* (2014) 223 Cal.App.4th 1242, 1253.) We review the trial court's valuation of community assets in a dissolution case for abuse of discretion. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 197.) "Generally, 'the appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered. [Citations.]' [Citation.] To the extent that a trial court's exercise of discretion is based on the facts of the case, it will be upheld 'as long as its determination is within the range of the evidence presented. [Citation.]' [Citation.] Conversely, a court abuses its discretion if its findings are wholly unsupported, since a consideration of the evidence 'is essential to a proper exercise of judicial discretion.' " (*Ibid.*)

Business and Professions Code section 14100 defines the "good will of a business" as "the expectation of continued public patronage." Because a community interest can only be acquired during marriage, "the value of the goodwill must exist at the time of the dissolution and that value must be established *without dependence on the potential or continuing net income of the professional spouse*." (*In re Marriage of King* (1983) 150 Cal.App.3d 304, 309, italics added.) "[T]he value of goodwill existing at the time of marital dissolution is separate and apart from the expectation of the spouses'

14

future earnings." (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 633-634.) It is therefore improper to base a goodwill valuation on the expectancy of future earnings because "community property interests may be acquired only during marriage and it would be inconsistent with that philosophy to assign value to the postmarital efforts of either spouse." (*In re Marriage of Rives* (1982) 130 Cal.App.3d 138, 150.)

Although the judgment (but not the statement of decision) refers to the goodwill the court awarded to Michael as "business goodwill," the evidence upon which the court based its finding of goodwill reflects that the court improperly awarded Michael *personal* goodwill, rather than the goodwill of any of his business entities, and, in any event, improperly based its goodwill valuation on the expectancy of Michael's future earnings.[5]

The goodwill finding in this case is analogous to the goodwill finding in *McTiernan*, *supra*, 133 Cal.App.4th 1090. The trial court in *McTiernan* found there was goodwill in the husband's business as a motion picture director and valued the goodwill at $1.5 million. (*Id.* at p. 1093.) The trial court reasoned that the husband's exceptional success as a director was "dependent upon his personal skill, experience and knowledge, and . . . that . . . the profession which he practices is similar to that of an attorney,

---

5    In its statement of decision, the court referred to the goodwill as "Husband's goodwill." Although "[g]oodwill as a divisible asset does not exist apart from the business or professional practice to which it attaches[,]" (*In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090 (*McTiernan*), 1112, conc. opn. of Boland J.), the court separately valued "Husband's goodwill" and awarded it to Michael as a distinct asset. The goodwill is not included in the calculation of the value of MCDII or any of the other business entities addressed in the statement of decision or in Yip's report, upon which the court largely based its business valuations.

15

physician, dentist, accountant, editor, architect, or any other professional who has established a successful professional practice, with quantifiable expectation of future patronage, based upon his or her personal skill, experience and knowledge." (*Id.* at p. 1094.)

Noting that Business and Professions Code section 14100 defines the "good will of a business" as "the expectation of continued public patronage[,]" the majority opinion in *McTiernan* addressed whether the term "a business" included "a person doing business" or referred only "to a professional, commercial or industrial enterprise with assets, i.e., an entity other than a natural person." (*McTiernan*, *supra*, 133 Cal.App.4th at p. 1096.) The majority decided the latter meaning was the correct one, noting that "[n]o California case has held that a natural person, apart and distinct from a 'business,' can create or generate goodwill. In the instance of professionals, the courts have spoken of 'the nature and duration of his business as a sole practitioner' [citation] and of the value of a 'professional practice' [citations]. It is the business, i.e., the practice, that generates goodwill, even if the practice is conducted by a sole practitioner . . . ." (*Id*. at p. 1098.) The majority concluded: "It is clear that, from an economic perspective, the 'goodwill' in this case is based on earnings, and that 'goodwill' is an expression of husband's earning capacity. However, there is no guaranty, especially in the arts, that earnings will not decline or even dry up, even though expectations were to the contrary. In such an event, a person would find him- or herself saddled with a massive liability without the means of satisfying it. Putting it another way, endowing directly persons

16

with the ability to create goodwill would create an 'asset' predicated on nothing other than predictions about earning capacity." (*Id.* at p. 1099, fn. omitted.)[6]

Yip's testimony about his goodwill analysis shows that his goodwill determination was essentially predicated on his predictions about Michael's *future earning capacity* as a real estate developer. Yip testified that he determined there was goodwill to be appraised based on Michael's reputation in the quality of houses that he had built in the past, his vendor relationship with the subcontractors, and his "know-how" and contacts. Yip stated that "all these would put him into a position such that *at the time when the market rebound*[*s*], he would be able to leverage and capitalize on that to again get back into the business and generally profit." (Italics added.) Yip assumed Michael would capitalize future business and invest $523,000 per year, but testified: "I cannot . . . say I know for sure as of a *certain time in the future* when [Michael] would have the amount available." (Italics added.) Yip's goodwill calculation also assumed Michael would be able to attract an unidentified equity partner, and that "90 percent of the equity capital that's required will be kicked in by the financial partner who returned it at 50 percent profit. So [Michael's] contribution to the capital . . . at the level that we're using, which is the average over a long period of time in terms of the number of houses to be built in, say, the given year, is 10 percent of that equity capital plus some seed money to secure loans."

---

6    A concurring justice in *McTiernan* separately concluded that as a matter of law, the husband did not own a business or professional practice to which goodwill could attach because goodwill is transferable as property and the husband could not "sell or otherwise transfer his 'professional practice' or 'business' to a third party." (*McTiernan*, *supra*, 133 Cal.App.4th at pp. 1111-1112, 1114, conc. opn. of Boland, J.)

17

The court questioned the "Goodwill of Crews Entities" heading in Yip's report and observed, "These entities aren't going to exist. There are no entities. So you're really talking about his personal goodwill, are you not?" The court later said it was "having trouble conceptually with this because it seems like we're talking about [Michael] personally[,]" and suggested that Yip's goodwill valuation was subject to reversal under *McTiernan*. Yip responded that he viewed Michael and his businesses as the same, stating that "whether we have MCDII that is going out of business but *later on when the market rebounds* we have an MCDIII, in my mind it's a continuation of a business that [Michael] has been in for . . . 20, 30 years." (Italics added.)

In its statement of decision, the court referred to Yip's report as valuing "*Husband's* goodwill at $474,000." (Italics added.) The court accepted Yip's goodwill valuation "and the underlying calculations[,]" and awarded the goodwill to Michael. The court found that "[Michael] will again be able to generate excess earnings *when the real estate development industry recovers*. His history also indicates that he will be able to obtain the necessary capital for this purpose." (Italics added.)

It is clear from the above italicized language in Yip's testimony and the statement of decision that the court's goodwill valuation was based entirely on the expectancy of Michael's earnings at some unknown time in the future when the real estate development industry will have recovered to the point where Michael can earn the same income he was earning before the severe downturn in that industry. The court's assumption that he would be as successful in the future as he had been in the past was based on the evidence of his skill, reputation, and experience as a real estate developer. However, a spouse's

18

"skill, reputation and experience are not community property and may not be divided in a dissolution . . . ." (*In re Marriage of Rives*, *supra*, 130 Cal.App.3d at p. 153.) The court's goodwill finding contravenes the principle that "the value of the goodwill must exist at the time of the dissolution and that value must be established without dependence on the potential or continuing net income of the professional spouse"—i.e., the expectancy of the spouse's future earnings. (*In re Marriage of King*, *supra*, 150 Cal.App.3d at p. 309; *In re Marriage of Duncan*, *supra*, 90 Cal.App.4th at pp. 633-634.)

Kelly contends substantial evidence presented at trial supports the finding that the goodwill the court awarded to Michael was business goodwill and not personal goodwill. Specifically, she asserts that both Yip and his forensic expert Karen Kaseno testified that the goodwill was attributable to the "Crews Entities." Although Yip testified that he viewed Michael and Michael's businesses as being the same, as we discussed above, his goodwill determination was fundamentally based on the *future* income he expected Michael would earn as a real estate developer given his *personal* skill, reputation, and experience, which are not subject to division in a dissolution. (*In re Marriage of Rives*, *supra*, 130 Cal.App.3d at p. 153.)

As for Kaseno, we note the court did not base its goodwill finding on her testimony. Rather, the court in its statement of decision noted *Yip's* goodwill value and stated: "The Court accepts this value and the underlying calculations." In any event, Kaseno's testimony shows that her goodwill determination, like Yip's, was based on the expectancy that Michael would earn *future* income through his *personal* skill, reputation, and experience as a real estate developer. When the court asked Kaseno if the goodwill

19

she valued was Michael's personal goodwill, she responded that the goodwill was "in the form of several entities at the moment," but she added that "[Michael] is capable of doing all of these tasks and all of these things that he clearly has been doing over the last few years in a bad market, and he has maintained relationships. *He has . . . the knowledge and expertise to be able to in the future earn money at a level most people can't.*" (Italics added.) The court asked, "So it's a personal goodwill?" Kaseno replied, "It is." The court said, "Him as an individual." Kaseno then stated, "Well, and I don't want you to use that term because I know that there's . . . case law that says personal goodwill versus other types. This is in an entity right now." The court responded: "Well, but I know the entity has no goodwill. I mean, I can look at that and see—what goodwill does an entity have that is defaulting on its debts, that is in trouble with the banks, and so forth? It clearly doesn't—to my way of looking at goodwill, it doesn't have it."[7]

Thus, Kaseno's testimony regarding the nature of the goodwill was ambiguous at best. Notwithstanding her conclusory assertions that the goodwill was in one or more business entities, like Yip, she based her goodwill determination on the expectancy that Michael would earn substantial income in the future through his personal skill, reputation, and experience as a real estate developer. Neither Yip's nor Kaseno's

---

[7]     Kaseno later agreed when the court observed: "[Y]ou're not really defining what type of goodwill this is. You're just saying he's demonstrated that he can make money above whatever average you want to use, and therefore, there's our excess earnings you can capitalize and use that model."

testimony constitutes substantial evidence that there was goodwill in any of the community business entities at the time of trial.[8]

Moreover, even if the expectancy of Michael's future earnings were a proper basis for valuing his business goodwill, Yip based his calculation of Michael's future earning capacity on assumptions that were too speculative to constitute substantial evidence. Yip speculated that Michael would capitalize future business and invest $523,000 per year but could not say when he would actually be able to do so. Yip also speculated that Michael would be able to attract an unidentified equity partner who would contribute "90 percent of the equity capital that's required," and that the real estate development market would recover in two to three years. However, the court acknowledged in its statement of decision that Michael's "estimate of another 3 to 5 years for home building to recover could well be correct[,]" and Yip testified that his goodwill number would be much smaller if he assumed a five-year period before the real estate market recovered, and would be "significantly reduced" if he assumed a 3-4 year period." "The court may not consider speculative factors when valuing community assets." (*In re Marriage of Duncan*, *supra*, 90 Cal.App.4th p. 634.) Because the court's goodwill finding is not supported by substantial evidence, it was an abuse of discretion to award goodwill to Michael as a community asset.

---

[8]    Kelly argues the goodwill awarded to Michael was business rather than personal goodwill because there was evidence that some of the Crews business entities were still operating and employing staff at the time of trial. However, evidence that a business entity was still operating at the time of trial is not evidence that the business had goodwill. Yip's goodwill determination, which the court adopted, was based on the expectancy of Michael's future earnings through his personal effort; not the ongoing operation of the businesses he was winding down at the time of trial.

21

### III. *Valuation of the Jet Airplane*

Michael contends the court abused its discretion in valuing the parties' corporate jet airplane on the date of separation instead of the date of trial. In its statement of decision, the court addressed the value of the airplane as follows: "The Court finds that the parties' airplane had a value of $775,000 at the time [Kelly] was awarded its management.[9] This is based on a later offer to purchase that the parties did not accept. The debt against the airplane is approximately $340,000, for a net value of $435,0090. [Michael] is awarded the airplane at this net value . . . . [¶] The Court agrees with [Michael's] testimony that the airplane has lost over $200,000 in value. The Court has used the higher value because of [Michael's] lack of cooperation in promptly paying maintenance invoices when they were presented as well as his delay in confirming the validity of the PMA."

Earlier in the statement of decision the court elaborated on Michael's failure to "forthwith" make his separate property election under the PMA, which the court found "troubling." The court stated: "The real estate development market was in free-fall between the date of filing [for dissolution] in July 2007 and [Michael's] election in October 2008. Accordingly, the community estate was greatly reduced in value during this period and [Michael's] $5.0 million election arguably consumes all or nearly all of

---

9    The statement of decision earlier noted that "[f]ollowing a hearing on April 1, 2008, [Kelly] was given management and control of the day-to-day operations of the parties' airplane as well as marketing it for sale. The airplane has still not been sold. [Michael] claims that [Kelly] did not properly manage, maintain or insure the airplane. The total damages claimed by [Michael] are $342,500 for loss of charter revenue and damage to the plane by not keeping it in a [hangar]."

the community estate based on the reduced asset values. [Michael] should not be permitted to select the date of valuation in a decreasing market and, in addition, pick particular assets with the benefit of hindsight. . . . The court finds that this is neither fair nor reasonable. Under these circumstances, certain assets assigned to [Michael] as part of his $5.0 million allocation were assigned at values favorable to [Kelly]. As hereinafter provided in more detail, the Court awarded Emerald Crest [Development II, GP and its principal asset (225 acres of undeveloped mitigation land known as Brook Forest)] to [Michael] at [Kelly's] value and the airplane at an earlier value that was considerably greater than its present value."

In the section of the statement of decision addressing the parties' claims for breach of fiduciary duty, the court agreed "with [Kelly's] claims relating to Brook Forest and the airplane. [Michael] did not timely, accurately and completely disclose the interest CalTrans had shown in a possible purchase of Brook Forest. Also, he did not cooperate with [Kelly's] management of the airplane. For these reasons the Court is awarding the parties' interest in Brook Forest to [Michael] at the value placed on it by [Kelly's] appraisers, and is awarding the airplane to [Michael] at a fair market value of $775,000, rather than the reduced value he is claiming due to [Kelly's] alleged mismanagement."

In short, the court valued the airplane at a higher value than its value at the time of trial for three reasons: (1) Michael's failure to disclose CalTrans's interest in Brook Forest property to Kelly; (2) his delay in electing his separate property under the PMA; and (3) his delayed payment of invoices regarding the plane and lack of cooperation

23

with Kelly in her management of the plane. Michael contends the first two reasons are invalid because he had no duty to disclose a mere interest in the Brook Forest property that never ripened into negotiations or an offer to purchase the property, and there is no connection between the PMA and the airplane. Regarding the third reason, Michael argues that he delayed paying invoices because he had to review them for mistakes, and even if the delayed invoices were a sufficient reason for the court's valuation of the airplane, the matter should be remanded for redetermination because two of the court's three reasons for the valuation are erroneous. Michael cites *In re Marriage of Abrams* (2003) 105 Cal.App.4th 979 (*Abrams*), in which the Court of Appeal remanded the issue of attorney fee sanctions because it decided that only one of the trial court's three reasons for imposing the sanctions had merit and could not "say with any certainty that the court necessarily would have exercised its discretion in the same fashion based only on the one valid reason." (*Id.* at p. 993, disapproved on another point in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072, 1097.)

Notwithstanding *Abrams*, we conclude the court acted within its discretion in valuing the parties' corporate airplane based on its finding that Michael breached his fiduciary duty by delaying payment of invoices and not cooperating with Kelly in her management of the plane.[10] Section 2552, subdivision (a) provides that "[f]or the purpose of division of the community estate upon dissolution of marriage or legal separation of the parties, . . . the court shall value the assets and liabilities as near as

10    Michael disagrees with the finding that he was uncooperative in the management of the airplane but does not contend it is not supported by substantial evidence.

practicable to the time of trial." However, section 2552, subdivision (b) provides that "[u]pon 30 days' notice by the moving party to the other party, the court for good cause shown may value all or any portion of the assets and liabilities at a date after separation and before trial to accomplish an equal division of the community estate of the parties in an equitable manner."[11] The court has considerable discretion under section 2552, subdivision (b) "to divide community property in order to assure an equitable settlement is reached." (*In re Marriage of Geraci* (2006) 144 Cal.App.4th 1278, 1290-1291.) "As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it." (*In re Marriage of Duncan*, *supra*, 90 Cal.App.4th at p. 625.)

Section 1100, subdivision (e) provides, in relevant part: "Each spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships . . . until such time as the assets and liabilities have been divided by the parties or by a court."[12] Section 1101, subdivision (g) provides, in relevant part:

---

[11]  Kelly's trial brief reveals that in August 2009 she filed a motion to use an alternative valuation date under section 2552, subdivision (b) instead of the date of trial. The court deferred the motion to trial. Although the trial brief does not state which assets the motion addressed, the trial brief itself gave notice that Kelly sought an alternative valuation date for the airplane, stating: "The Court could also apply an alternative date of valuation to the airplane, or various other assets." Michael does not contend on appeal that the statutory notice requirement was not satisfied.

[12]  Section 1101, subdivision (a) provides: "A spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate, including, but not limited to, a single transaction or a pattern or series of transactions, which transaction or

25

"Remedies for breach of the fiduciary duty by one spouse . . . shall include, *but not be limited to*, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty . . . . The value of the asset shall be determined to be its highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court." (Italics added.)

Reading section 2552, subdivision (b) and section 1101, subdivision (g) together, we conclude the court had discretion to use an alternative valuation date for the airplane as a remedy for Michael's breach of fiduciary duty regarding the management of the airplane. Although the valuation-date provisions in subdivision (g) of section 1101 concern the valuation of assets that were undisclosed or transferred in breach of a spouse's fiduciary duty, they provide guidance to the trial court in crafting remedies for other breaches of fiduciary duty that affect or relate to the value of a community asset. The court stated in its statement of decision that it assigned the airplane its value "at the time [Kelly] was awarded its management." Kelly testified at trial that she had ongoing problems with Michael concerning the airplane from the time she began managing the airplane and throughout the year following July 2008 when she hired a new company to manage it. Thus, the value the court assigned the airplane comported with the spirit of section 1101, subdivision (g) because it was the airplane's highest value at the time

transactions have caused or will cause a detrimental impact to the claimant spouse's undivided one-half interest in the community estate."

26

Michael began breaching his fiduciary duty by not cooperating in its management. We conclude the court did not abuse its discretion in valuing the airplane.

IV. *Division of the Community Estate*

Michael contends the court abused its discretion by not dividing the community estate equally.

Section 2550 requires the trial court in a marital dissolution action to value and equally divide the parties' community property estate, unless the parties have agreed otherwise.[13] " '[T]he court must distribute both the assets and the obligations of the community so that the residual assets awarded to each party after the deduction of the obligations are equal.' " (*In re Marriage of Walrath* (1998) 17 Cal.4th 907, 924.) The trial court has broad discretion in discharging its duty to divide community property in a way that is not only mathematically equal but practical and equitable as well. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 885; §§ 2550, 2010, subd. (e).) Accordingly, we review the trial court's division of marital property for an abuse of discretion. (*In re Marriage of Sivyer-Foley & Foley* (2010) 189 Cal.App.4th 521, 526).

If the amount of the community debt exceeds the total value of the community assets, the court may assign the excess debt as it "deems just and equitable, taking into account factors such as the parties' relative ability to pay." (§ 2622, subd. (b).)

---

[13]    Section 2550 provides: "Except upon the written agreement of the parties, or on oral stipulation of the parties in open court, or as otherwise provided in this division, in a proceeding for dissolution of marriage or for legal separation of the parties, the court shall, either in its judgment of dissolution of the marriage, in its judgment of legal separation of the parties, or at a later time if it expressly reserves jurisdiction to make such a property division, divide the community estate of the parties equally."

However, if the community assets exceed the community liabilities, the court has "no discretion to adjust the division of the residual assets to reflect equitable considerations." (*In re Marriage of Schultz* (1980) 105 Cal.App.3d 846, 854.)

Michael complains that the court omitted from its statement of decision a number of business interests that Yip valued in his final report. Yip assigned some of these "omitted" assets positive values and others negative values.[14] Michael points out that the net value of the excluded assets is a negative $1,442,679, and argues that excluding them resulted in an unequal division of the community estate. According to his calculations, a correct division of the residual community estate, including the excluded assets, would result in Kelly owing him $721,590. Michael invites us to amend the judgment by substituting his calculations for the trial court's calculations.

Preliminarily, Michael's characterization of the assets and debt in question as having been "omitted" from the statement of decision and judgment is inaccurate. Each of the 18 business entities in question is listed in an attachment to the statement of decision and in the body of the judgment, and the court awarded all of them to Michael

---

[14] Michael lists 14 business entities that Yip appraised at either a positive or zero value, and four entities that Yip assigned a negative value. The positive-value entities are MCD, Inc. valued at $17,161; MGP Murrieta, LP valued at $263,050; Seadrift Ranch Partners valued at $527,086; Musket Oil valued at $24,000; Seadrift Harbor Partners, LP valued at $81,600; and Tyson Crews Land Holdings, Inc. valued at $30,561. The negative-value entities are Riverwood Hollow, LLC valued at negative $917,051; MCCD, GP, valued at negative $96,257; MCCD, Inc. valued at negative $1,370,988; and Michael Crews Realty, Inc. valued at negative $1,841.

28

at a net value of zero.[15]  In its statement of decision under the heading "Remaining Business Interests and Debt" the court ruled:  "These remaining business assets are awarded to [Michael] at no net value.  [Michael] is given the exclusive authority to negotiate and restructure the outstanding business debt.  *The Court is aware that these businesses could arguably have an overall negative value if [Michael] is unsuccessful in obtaining a write-down and restructuring of at least the two largest remaining unresolved creditor claims.*  The Court finds, however, that [Kelly] has no realistic ability to satisfy these claims.  The parties have consistently demonstrated that they cannot work effectively together.  Under these circumstances, [Michael] should be afforded his best opportunity to negotiate a debt reduction that *could* result in a positive net value for the remaining business interests.  That would be fair compensation for his continuing efforts.  If he is unsuccessful, and there is as negative estate value after the PMA allocations, [Michael] is assigned that negative value pursuant to *In re Marriage of Eastis* (1975) 47 Cal.App.3d 459[, 464] and Family Code section 2622(b)."  (Italics added.)  This language is substantially repeated in the judgment.

---

[15]     In addition to the 14 positive and zero-value business entities that Michael claims were omitted from the statement of decision, he inexplicably lists "one-half of Mission Oaks Bank stock divided equally" as one of the omitted zero-value assets, and cites to the portion of the statement of decision that divides that stock.

We conclude that in dividing the community estate, the court erred by awarding all of the "remaining" business interests to Michael at zero value rather than making findings as to their present value, whether based on Yip's appraisal or other evidence. As to the interests that Yip assigned either a positive or negative value, there is no substantial evidence to support the court's assignment of zero value. The quoted language from the statement of decision and judgment shows that the court awarded the remaining businesses to Michael at zero value even though the court acknowledged they had a net negative value and that Michael may not be able to restructure the debt on the negative assets and turn them into positive assets. The court lacked discretion to award a negative-value asset to Michael at zero value based on the speculation that he *might* be able to turn the business into a positive-value asset in the future.

Kelly argues that it was appropriate to award MCCD, Inc. (valued at negative $1,370,988) and Riverwood Hollow, LLC (valued at negative $917,051) to Michael at zero value because there is substantial evidence that the debt against MCCD, Inc. would never be collected and there was no personal liability arising out of the debt against Riverwood Hollow. She contends that after removing the MCCD, Inc. debt from the list of omitted assets, the difference Michael presents is only $71,691, which Kelly views as an immaterial amount "within the scope of the $7-7.5 million residual community assets." Michael argues the community is liable for the MCCD, Inc. debt by personal guarantee and an alter ego theory. Whether Yip correctly valued the "remaining" assets and whether the debt he assigned to the negative-value assets is properly factored into the division of the community estate are factual issues that are not appropriately decided

30

by this court. Accordingly, we decline Michael's invitation to amend the judgment by substituting his calculations (based on Yip's appraised values for the "remaining business interests and debts") for those set forth in the portion of the judgment dividing the community estate. We will reverse that portion of the judgment and remand the matter for a redetermination of the proper division of the community estate under section 2550 based on evidence of the actual value of each community property asset.

*KELLY'S APPEAL*

I. *Michael's Breach of the PMA*

Kelly contends the court erred by failing to enforce the provisions in the PMA regarding the division of property in the event of a dissolution action. The PMA provided that all of the parties' real and personal property was deemed their community property, and that if one of the parties filed for dissolution of the marriage, "the following property division and/or distribution shall forthwith occur . . . : [¶] 1. MICHAEL shall unilaterally be permitted to transfer from the community property assets into his name alone five million dollars ($5,000,000). . . . [¶] 2. KELLY shall unilaterally be permitted to transfer from the community property assets into her name alone $126,000." As noted, Michael did not make his separate property election under the PMA "forthwith" after he filed for dissolution in July 2007 because he claimed the PMA was invalid. He changed his position in October 2008 and attempted to make his election then, but Kelly successfully moved to restrain transfer of any assets to Michael pending trial.

31

In its statement of decision, the court ruled that the PMA was a valid transmutation agreement, and that Michael was "entitled to change his position on the validity of the [PMA] as the case evolve[d] and he develop[ed] more factual and legal knowledge." The court found that Michael's "final position was known more than two years before trial and the change did not prejudice [Kelly's] ability to present her case." However, the court stated that Michael's failure to forthwith make his separate property election was "more troubling to the Court." As we noted in our discussion regarding the airplane valuation, the court found the value of the community estate was greatly reduced between the date Michael filed for dissolution and October 2008 when he first attempted to make his separate property election under the PMA. The court further found that Michael's $5 million election at the time of trial "arguably consumes all or nearly all of the community estate based on the reduced asset values[,]" and that it would be unreasonable and unfair to Kelly for him to "select the date of valuation in a decreasing market and, in addition, pick particular assets with the benefit of hindsight." The court compensated Kelly for Michael's failure to make his separate property election forthwith by (1) awarding Michael the Brook Forest property at $4.5 million, the value Kelly claimed, instead of $2.75 million, the adjusted value that Yip and another court appointed appraiser determined, and (2) awarding him the jet airplane "at an earlier value that was considerably greater than its present value."

Kelly contends that the court's language in the statement of decision describes a breach of the PMA, and that Michael's failure to make his separate property election "forthwith" allowed him to receive over $14 million in distributions of community assets

32

during the pendency of the litigation to operate businesses that the court ultimately awarded to him. Therefore, she argues, Michael's breach of the "forthwith" provision resulted in damages to her in an amount equal to one half of the community assets distributed to Michael before he made his election, or $7 million.[16]

We agree with Kelly that the court impliedly, although not expressly, found both that Michael breached the PMA by not making his separate property election "forthwith" and that Kelly suffered damages as a result of the breach. We also agree that the remedy the court provided Kelly for the breach was not a proper remedy for breach of the PMA. A marital agreement regarding the character and division of property is enforceable as a contract absent proof it was procured by fraud, constructive fraud, duress, or undue influence. (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 13 [premarital agreement]; *In re Marriage of Davis* (2004) 120 Cal.App.4th 1007, 1018 [a marital settlement agreement is governed by the legal principles applicable to contracts generally]; *In re Marriage of Benjamins* (1994) 26 Cal.App.4th 423, 429 [agreements between spouses are construed under the statutory rules governing the interpretation of contracts generally unless a statute provides otherwise]; *Rosson v. Crellin* (1949) 90 Cal.App.2d 753, 755 [agreement for support in property settlement agreement held enforceable in the same manner as any other agreement]; *In re Marriage of Woolsey* (2013) 220 Cal.App.4th 881, 897-898 [property settlement agreement between spouses is valid and binding on

---

[16] Kelly arrives at the same damages figure by a different path by arguing that the $14 million in community assets Michael received before trial should be deemed to include his $5 million separate property election under the PMA, and that the remaining $9 million, plus the $5 million he ultimately elected to take as separate property under the PMA should be divided equally as community property.

the court unless it is tainted by fraud or compulsion or violates the fiduciary relationship between the parties].)

" 'The basic object of damages is *compensation*, and in the law of contracts the theory is that the party injured by breach should receive as nearly as possible the equivalent of the benefits of performance.' " (*Lisec v. United Airlines, Inc.* (1992) 10 Cal.App.4th 1500, 1503.) Civil Code section 3300 provides that the measure of damages for a breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." "[T]he correct measure of damages *in any given case must always be* [the measure provided by Civil Code section 3300.]" (*Pacific Scientific Co. v. Glassey* (1966) 245 Cal.App.2d 831, 842, italics added.)

Although the court did not expressly state that Michael "breached" the PMA, by finding that Michael's failure to make his separate property election "forthwith" caused detriment to Kelly warranting some remedy, the court effectively found that Michael breached the PMA and that Kelly suffered damages as a result. However, the court fashioned its own equitable remedy for the breach without regard to the proper measure of damages under Civil Code section 3300—i.e., the court did not consider the amount that would compensate Kelly for all the detriment proximately caused by the breach or that, "in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.) Although we have decided that awarding the airplane to Michael at its higher pretrial value was a proper remedy for Michael's breach of fiduciary duty concerning the

34

management of the airplane, it was not a proper remedy for Michael 's breach of the PMA. Nor was the court's acceptance of Kelly's claimed value of the Brook Forest property a proper remedy for Michael's breach of the PMA because there is no finding that awarding the Brook Forest property (or the airplane) to Michael at Kelly's value compensated Kelly for any detriment proximately caused by Michael's breach of the PMA. Consequently, we will remand the matter for determination of the damages, if any, that Kelly suffered as a result of Michael's breach of the PMA and direct the trial court to redetermine the value of the Brook Forest property for purposes of dividing the community estate.[17]

Kelly suggests that we direct the trial court on remand to deem the $14 million distributed to Michael from the community estate during the dissolution proceedings to include his $5 million separate property election, and to find that her damages for his breach of the PMA are one half of all the post-separation community assets distributed to him. We decline to do so because the amount of Kelly's damages caused by Michael's breach of the PMA is a factual issue that must be resolved through further proceedings in the trial court. (*Gersick v. Shilling* (1950) 97 Cal.App.2d 641, 645; *Quality Wash Group V, Ltd. v. Hallak* (1996) 50 Cal.App.4th 1687, 1695, fn. 3.)

---

[17] As noted, the trial court valued the Brook Forest property at the higher amount Kelly claimed based both on Michael's breach of the PMA and its finding that Michael breached his fiduciary duty by not disclosing CalTrans's interest in the property to Kelly. We will not sustain the court's valuation based on the breach of fiduciary duty finding because we cannot say the court likely would have accepted Kelly's valuation of the property based solely on Michael's failure to disclose CalTrans's interest in the property, had Michael's compliance with the PMA not been an issue.

Further, we reject Kelly's argument that the trial court must deem the community assets that Michael received before trial to include his $5 million separate property election. In its statement of decision, the court expressly found that "the drastic reduction in [the parties'] community estate after separation was caused by the free-fall in the real estate development market and not [Michael's] claimed mismanagement or [Kelly's] claimed inability to make timely, intelligent decisions[,]" and that Michael had used the community funds distributed to him during the pendency of the litigation "in an attempt to salvage the businesses and only minimally for his own benefit." The court stated, "[Michael's] efforts have been not just reasonable but monumental."

The court noted that at the time of trial, Michael had been working to salvage and wind down the community businesses for approximately 41 months, and that it would "take another 12 months to complete the wind down, for an overall total of 53 months to completion." Michael's services for that total period had a value of $2,054,068 according to Yip's calculations, and had a value of $4.875 million according to the testimony of Michael's expert. Although the court found that either figure "may be reasonable compensation in the abstract," it denied Michael's request for compensation, in part because it found that "[t]he real benefits to [Michael] for performing these services is to protect the $5 million he is entitled to receive under the PMA and to protect his reputation as a builder so that he can return to his chosen field when the market recovers." However, in finding that Michael properly used the community funds he received during the pendency of the litigation to wind down and salvage the community businesses, the court stated that "[t]he reasonable value of his services, for

36

which he is largely not being compensated, greatly exceed any personal benefit he received [from the pretrial distributions of community funds to him]."

In light of the court's findings that Michael properly used the community funds he received before trial to preserve the community estate and not for his own benefit, that his efforts were "monumental," and that he was not compensated for his services, we conclude the court did not abuse its discretion in ruling that Michael was entitled to make his separate property election from the community assets that remained at the time of trial. However, as we discussed, Kelly is entitled on remand to a determination of the amount of damages, if any, that were proximately caused by or likely to result from Michael's breach of the PMA in failing to make his $5 million separate property election "forthwith."[18]

_____

[18] Kelly also complains that the court erred by failing to enforce its October 2007 order that required Michael to obtain her informed consent before infusing any of the parties' assets into their businesses. However, Kelly has not shown that she was prejudiced by the court's failure to enforce this order—i.e., she has not explained how the court's failure to enforce the order affected the judgment in a way that could be remedied on appeal. In its statement of decision, the court rejected Kelly's claim that Michael breached his fiduciary duty and disclosure requirements relating to "violating [automatic temporary restraining orders] by liquidating assets in order to inject funds into the businesses and continu[ing] operations." It was in the context of rejecting this claim that the court found that Michael's efforts to restructure community debt were "not just reasonable but monumental," and that the reasonable value of his services greatly exceeded any personal benefit he received.

## II. *Request for Attorney Fees*

Kelly contends we should require Michael to contribute to her attorney fees on appeal under section 2030 in an amount the trial court deems just and proper.[19] Michael correctly responds that Kelly's request for attorney fees on appeal must first be made in the trial court. (§ 2030, subd. (c); *In re Marriage of Schofield* (1998) 62 Cal.App.4th 131, 140-141; *In re Marriage of Brown* (1995) 35 Cal.App.4th 785, 791-792, fn. 8.)[20] The trial court's October 9, 2012 order shows that Kelly made her request for attorney fees on appeal in the trial court and the court reserved jurisdiction to decide the matter later. Accordingly, we will not further address the issue.

---

[19] In connection with her request for attorney fees, Kelly filed an unopposed request for judicial notice of an order entered on October 9, 2012, in which the trial court declined to rule on Kelly's request for additional attorney fees under section 2030 and reserved jurisdiction "for Kelly to renew her request at a future date once funds become available from . . . tax returns." Kelly seeks judicial notice of the order because it shows that the court denied her request for additional fees without prejudice. We grant the request for judicial notice, and note that Michael has acknowledged in this appeal that the trial court denied Kelly's request for additional fees without prejudice.

[20] Section 2030, subdivision (c) provides: "The court shall augment or modify the original award for attorney's fees and costs as may be reasonably necessary for the prosecution or defense of the proceeding, or any proceeding thereto, *including after any appeal has been concluded*." (Italics added.)

38

DISPOSITION

The portions of the judgment on reserved issues awarding child and spousal support, valuing and awarding goodwill, and dividing the community property are reversed. The matter is remanded with directions to redetermine child and spousal support for the relevant time period without imputing income to Michael. The court is further directed to redetermine the value of the Brook Forest property for purposes of determining the value of Emerald Crest Development II, GP, and to redetermine the division of community property based on the actual values of all community assets identified in the judgment, including those listed in paragraph J., entitled "Remaining Business Interests and Debts," of section 14, entitled "VALUATION AND DIVISION OF COMMUNITY PROPERTY AND DEBTS." The court is also directed to determine and award Kelly damages, if any, that were proximately caused or likely to result from Michael's breach of the PMA. In all other respects the judgment is affirmed. The parties shall bear their own costs, other than attorney fees, on appeal.

IRION, J.

WE CONCUR:

McDONALD, Acting P. J.

O'ROURKE, J.